# JAMES B. JOHNSON v. UNITED RAILWAYS COMPANY et al., Appellants.

### In Banc, February 16, 1920.

1. **SALE OF PROPERTIES: Liability of Vendee for Unpaid Debts: Preference.** Where one company took from another a large amount of property, far in excess of the claim of a judgment creditor of the vendor, for which the said transferee paid no consideration and to which it acquired no title, and placed it beyond the reach of such creditor, such transferee company must pay such judgment creditor. The vendor has the undoubted right to prefer one creditor to another, but it cannot transfer the exercise of the right to another company, so as to authorize the transferee to administer the vendor's assets. [Per CRAMER, Special Judge; WILLIAMSON, J., concurring, in a separate opinion in which WALKER, C. J., and WILLIAMS, J., concur; BLAIR, J., dissenting; GRAVES, J., with whom WOODSON, J., concurs, dissenting, for the reasons expressed by VALLIANT, C. J., in Johnson v. United Railways Co., 247 Mo. 1. c. 366.]

2. ————: **Unpaid Judgments: Amount Paid by Assignee: Clean Hands.** If the amount paid by the assignee of unpaid judgments is the amount that the judgment debtor cannot pay and his transferee refuses to pay, the assignee has a justiciable claim against the transferee, and is not chargeable with coming into court with unclean hands for that he paid only one-third of their face value. [Per WILLIAMSON, J.]

3. ————: ————: **Directors Trustee for Creditors.** To the extent to which the assets of a corporation may be regarded as a trust fund for its creditors, the directors are trustees of those assets for such creditors; and where a corporation transfers all its tangible assets to another, the president of such corporation is a trustee for the benefit of those persons who had existing claims against the corporation. [Per WILLIAMSON, J., with whom WALKER, C. J., and WILLIAMS, J., concur.]

4. ————: ————: ————: **Notice.** Where two corporations, at the time one of them transferred all its tangible assets to the other, had the same executive officers, the same claims department, the same counsel, and, with the exception of one member of each board, the same individuals upon the board of directors of each, the transferree company was chargeable with notice of the ex-

istence of judgments and suits for judgments against the other company, whether or not the transferee company, in the assignment instruments, assumed to pay such claims. [Per WILLIAMSON, J., with whom WALKER, C. J., and WILLIAMS, J., concur.]

5. ———: ———: **Assets in Excess of Consideration.** Where one corporation, in consideration of the release of a lease under which another was operating a system of street railways, took over all its tangible assets, assuming to pay its bonded and other contract debts, but not existing judgments for personal injuries, and thereby received property far in excess of the amount of the debts assumed, without paying any consideration for such excess and without the consent of such judgment creditors, leaving their judgments unsatisfied, and took the property under such circumstances as to amount to actual notice of such outstanding claims, the transferee company is legally bound to pay such claims, since the assets of the transferring company constituted a trust fund for the payments of its debts, and a transfer of assets, without consideration, is void as to creditors of the transferrer, though it assumed legal form. [Per WILLIAMSON, J., with whom WALKER, C. J., and WILLIAMS, J., concur; BLAIR, J., dissenting; GRAVES, J., with whom WOODSON, J., concurs, dissenting, for the reasons expressed by VALLIANT, C. J., in Johnson v. United Rys. Co., 247 Mo. l. c. 366.]

·6. ———: **Assignment, Sale or Release: Substantive Wrong: Equity.** It matters not by what name the transaction by which one corporation transferred all its assets to another is characterized, whether as a sale or assignment or the release of an existing lease, if its effect was to turn over, without consideration, a trust fund held by the one to pay its debts, to the other, and such transferee took the assets, knowing that they far exceeded the debts assumed, and with notice of the unpaid debts of the other, equity will hold the transfer void as to the existing creditors. Equity looks to substance and not form, and will not sanction an unconscionable result merely because it has been brought about by means which simulate legality. [Per WILLIAMSON, J., with whom WALKER, C. J., and WILLIAMS, J., concur.]

Appeal from St. Louis City Circuit Court.—*Hon. George H. Shields,* Judge.

AFFIRMED.

*H. S. Priest* for appellants.

(1) There is no suggestion in the petition of fraud by inference as a result of a practical common directory

of the two companies, or their want of contractual capacity as between themselves, and if there was, this would not be sufficient. The two companies would not lose their respective corporate individualities by such fact nor their capacity to contract with each other. R. S. 1909, sec. 3316, par. 7; Peterson v. Railway Co., 205 U. S. 364; Bank v. Big Muddy Iron Co., 97 Mo. 38; Kitchen v. Railway Co., 69 Mo. 224; Noyes Intercorporate Relations, sec. 299; Warfield v. Marshall Co., 72 Iowa, 666; Pullman v. Railway Co., 115 U. S. 587; Mooreshead v. Railway Co., 203 Mo. 121. It is at most a circumstance— like relationship between natural persons—which, coupled with other facts, might or might not show fraud. State v. Oil Cos., 194 Mo. 155. (2) In order for plaintiff to recover, it devolved upon him to show that, but for the sale and tranfer, he could have resorted to the property sold and conveyed for the payment of his debt. Burns v. Bangert, 92 Mo. 167; Simon v. Smith, 180 Mo. 464. (3) Plaintiff is not entitled to recover because he has neither shown that appellant Railways Company agreed to assume the liabilities of Transit Company, or that it took the assets of Transit Company without any or adequate consideration. Benesch v. Ins. Co., 72 N. E. 674; Baker v. Harpster, 22 Pac. 415; Ferschild v. Vedder, 49 N. E. 151; Goodfellow Shoe Co. v. Prickett, 84 Mo. App. 94; Alexander v. Williams, 14 Mo. App. 13; Kitchen v. Ry., 69 Mo. 224.

*John A. Gilliam* for respondent.

(1) Under the doctrine of *stare decisis,* when a matter has been thoroughly argued and decided, that decision becomes the law of the case, and if the losing party continues to litigate it should be taxed with ten per cent damages, and respondent asks that it be inflicted in this case. (2) The assets of a corporation are impressed with a trust in favor of creditors and no distribution can be made among shareholders until all debts and liabilities have been satisfied. South Bend Toy Mfg. Co. v. Ins. Co., 4 S. D. 173, 178-179; 2 Morawetz on Corp. 790; Berry v.

.Rood, 168 Mo. 316. (3) When the directory and principal officers of two corporations are substantially identical all transactions between them are prima-facie fraudulent as against the rights of creditors. Barrie v. United Railways Co., 125 Mo. App. 120; Noyes on Intercorporate Relations, sec. 124, pp. 194, 195; Alexander v. Williams, 14 Mo. App. 27; Kitchen v. Railway Co., 69 Mo. 251, 254, 261; Sweeney v. Sugar Co., 30 W. Va. 443; Ins. Co. v. Trans. Co., 13 Fed. 578; Railroad v. Evans, 66 Fed. 810; Couse v. Powder Co., 33 Atl. 297; Bank v. Alabama Sanitarium 103 Ala. 358, 369; Montgomery Web Co. v. Dienelt, 133 Pa. St. 585; Bank v. Judah, 8 Conn. 145; Coningham's Appeal, 57 Pa. St. 474; Chouteau v. Allen, 70 Mo. 338. (4) After insolvency the directors sustain a fiduciary relation to creditors and are bound to exercise the the utmost good faith, and upon the least appearance of unfairness, their transactions will be set aside. Hutchinson v. Sutton Mfg. Co., 57 Fed. 998; Bear River Orchard Co. v. Hanley, 15 Utah, 514; Thompson on Corporation (1 Ed.), sec. 4009 to 4016, 4022, 4079, 4080; Woodstock Inv. Co. v. Richmond, 129 U. S. 661. (5) When one corporation owns a controlling interest in another corporation and both are under one control and the officers and directors of both are substantially identical, all transactions as between them constitute a constructive fraud as against the rights of creditors and as to them are void. They cannot sell property to themselves at a valuation fixed by themselves. Farnum L. & T. Co. v. N. Y. Ry. Co., 150 N. Y. 430; Mason v. Pewabic Min. Co., 133 U. S. 50; United Gold and Platinum Co. v. Smith, 90 N. Y. S. 199; Montgomery Traction Co. v. Harmon, 140 Ala. 505. (6) When one corporation acquires all the assets of another corporation, issues its stock in exchange for the stock of the old company, and the old company ceases to be a going concern and the new company continues the business, the new company receives the assets of the old company burdened by its liabilities. Such arrangement has the effect of distributing assets of the old company among its stockholders to

the exclusion of creditors. This cannot be done. The new company will by operation of law be held to have assumed and agreed to pay the debts of its vendor, including a judgment subsequently recovered against it in an action for negligence which was pending at the time of the transfer. Berthold & Jennings v. Holliday-Klotz Lumber Co., 91 Mo. App. 233; Camden Interstate Ry. Co. v. Lee, 84 S. W. 332; Grenell v. Gas Co., 112 Mich. 70; U. S. Capsule Co. v. Isaacs, 55 N. E. 836; Wilson v. Aeolian Co., 72 N. Y. S. 150, 64 App. Div. 337, 170 N. Y. 618; Indianapolis R. R. Co. v. Jones, 29 Ind. 465; Thompson v. Abbott, 61 Mo. 176; Railroad v. Ashling, 160 Ill. 373; Dodson v. Railroad, 77 Md. 489; 10 Cyc. 303-308; Thompson on Corporations (1. Ed.), secs. 405, 8231, 8240-41; Cook on Corporations (7 Ed.), sec. 897; Eaus' Admr. v. Bank, 79 Mo. 182; Suddath v. Gallagher, 126 Mo. 393. (7) And in such case the new company holds the property received from the absorbed company with notice of any trust attaching to it in favor of creditors and cannot claim the rights of a bona-fide purchaser without notice. The Key City, 14 Wall (81 U. S.) 661. (8) Defendant's admission of knowledge of the financial conditions of the Transit Company renders it liable to creditors for all assets it acquired without consideration on without an adequate consideration. Under the circumstances in this case such conveyance is absolutely void. Sloan v. Torry, 78 Mo. 623; Kurtz v. Troll, 175 Mo. 506; 20 Cyc. pp. 508 to 510. And a conveyance of all of one's property while a suit is pending against him is a badge of fraud. That the action is in tort makes no difference. McCollum v. Crain, 101 Mo. App. 522. (9) The proof shows the identity of directors of Transit Company and United Railways Company, the control of both companies by Brown Brothers & Co., the receipt by both the directors and stockholders of the Transit Company of two shares of the United Railways Company for each of their five shares of the Transit Company stock, and a contract by Brown Bros. & Co. Syndicate with the other two companies in which Brown Bros. & Co. Syndicate were the simple conduit to transfer

the United Railways stock to the Transit stockholders, and the Transit stockholder's stock to the treasury of the United Railways Company, and the participation of Brown Bros. & Co., the directors of the two companies, and substantially all the stockholders of the Transit Company in both the purchase and sale of the Transit Company's property, every step being actually and constructively fraudulent as to creditors. Jones v. Williams, 139 Mo. 1; Noyes on Intercorporate Relations, sec. 123, note, p. 241.; Hospes v. Northwestern Mfg. Co., 48 Minn. 174; United Gold & Platinum Co. v. Smith, 90 N. Y. S. 199; Montgomery Traction Co. v. Harmon, 140 Ala. 505; Camden Interstate Ry. Co. v. Lee, 84 S. W. 332; Railroad Co. v. Howard, 74 U. S. (7 Wall.) 392; Union Natl. Bank v. Douglass, 1 McCrary's Rep. 86; Gwynn v. Butler, 17 Colo. 114; Bosher v. Worrill, 57 Ga. 235; Snyder v. Free, 114 Mo. 360; Cook on Corporations (5 Ed.), sec. 671; note 1, p. 1566; Vance v. McNabb Co., 92 Tenn., 47; Chattanooga Railroad v. Evans, 66 Fed. 809; Fort Payne Bank v. Alabama Sanitarium, 103 Ala. 358; Montgomery Web. Co. v. Diewelt, 133 Pa. St. 585; Couse v. Columbia Co., 33 Atl. 297; Singer v. Hutchinson, 183 Ill. 606; Vicksburg Co. v. Citizens' Tel. Co., 79 Miss. 341; San Francisco Railroad v. Bee, 48 Cal. 398; Wilson v. Aeolian Co., 64 N. Y. App. Div. 337; Metcalf v. Arnold, 110 Ala. 180; Buell v. Rope, 6 N. Y. App. Div. 113; Twin Lock Oil Co. v. Marbury, 91 U. S. 587; Sawyer v. Hoag, 17 Wall. 610; Louisville Trust Co. v. Louisville Ry. Co., 174 U. S. 674; Gratz v. Reed, 4 B. Mon. (Ky.) 195; Hurd v. New York Laundry Co., 167 N. Y. 94; Gillett v. Bate, 86 N. Y. 93; 20 Cyc. 449, note 19; Benne v. Schnecko, 100 Mo. 250.; Seger v. Thomas, 107 Mo. 635.

CRAMER, Special Judge.—Plaintiff brings this suit in equity against the United Railways Company of St. Louis and the Transit Company of St. Louis as assignee of certain judgments for personal injuries recovered by various parties against the Transit Company while it

was operating the street car lines in the City of St. Louis under a lease from the United Railways Company.

The ground on which he seeks to hold the United Railways Company liable appears from the following allegations of the petition:

"Plaintiff further states that on or about the 31st day of October, 1904, the entire property and assets of the said St. Louis Transit Company, including all the improvements and betterments made by it, were transferred to the said United Railways Company of St. Louis, which immediately assumed control and is now in possession thereof, both said companies being at the time of said transfer under one and the same management.

"And plaintiff further states that the object and purpose of said United Railways Company of St. Louis was to absorb said St. Louis Transit Company, by acquiring its assets and succeeding to its business, and to hinder, delay and defraud the creditors of the St. Louis Transit Company, and pursuant to that purpose, said St. Louis Transit Company was merged in the defendant United Railways Company of St. Louis; that on or about the 31st day of October, 1904, the defendant United Railways Company of St. Louis did receive, absorb and take over, without paying any fair and just consideration therefor, all the assets and property of said St. Louis Transit Company, including its business and good will, and said aforesaid leasehold, and also the sum of $614,-015.25 in cash, and thereafter carried on and is now carrying on and operating said street car system and the business as successor to the St. Louis Transit Company, and plaintiff is informed and upon information and belief states that upon receiving said assets and in consideration thereof, the said defendant United Railways Company of St. Louis, assumed and agreed and became liable to pay all liabilities of the said St. Louis Transit Company; and plaintiff is advised that in the absence of any agreement, defendant will, by operation of law, upon the facts aforesaid, be held to have assumed all such liabilities.

"Plaintiff is furthermore advised that the assets and property of said St. Louis Transit Company were, at the time they passed into the hands of defendant aforesaid, a trust fund, for the payment of all debts and liabilities of the St. Louis Transit Company, and when received and taken by defendant, were charged with such liability. And plaintiff says that defendant has appropriated to its own use the said assets and property of the value aforesaid, to-wit, $614,015.25 in cash, and a great amount of property and assets heretofore mentioned. the exact value of which plaintiff is unable to state, but not less than, to-wit, $20,000,000 in value.

"And plaintiff further states that the said transfer of the said assets of said St. Louis Transit Company was fraudulent and was conceived and carried out with intent to dispose of all the assets of the St. Louis Transit Company to the use and benefit of the said United Railways Company and the stockholders of St. Louis Transit Company and parties unknown to complainant conspiring with them in order to hinder, delay, defeat and defraud the creditors of said St. Louis Transit Company, and in order to assist the St. Louis Transit Company, its officers and stockholders in concealing the assets of said St. Louis Transit Company, and to hinder, delay, defeat and defraud the creditors of said St. Louis Transit Company, and in order to procure the votes of the stockholders of said St. Louis Transit Company to ratify an agreement to surrender the aforesaid leasehold to it, and to transfer a great part of the assets of said St. Louis Transit Company to said United Railways Company and with intent to hinder delay, defeat and defraud the creditors of said St. Louis Transit Company. said United Railways Company on or about the month of October, 1904, transferred to stockholders of the said St. Louis Transit Company, its own stock of the market value of to-wit, $1,605,000 and thereby joined in putting that amount of assets which should have gone into the treasury of said

St. Louis Transit Company, out of the reach of creditors of said St. Louis Transit Company, and where executions could not be levied upon the same, and thereby hindered, delayed, defeated and defrauded the creditors of said St. Louis Transit Company, whereby by reason of its participation in said fraudulent proceedings the said United Railways Company failed to get any valid title to the said assets of said St. Louis Transit Company received by it from said company, and became liable to the creditors of said St. Louis Transit Company, for the full amount of the same which have been received, held and used by it.''

On the 10th day of March, 1898, the Central Traction Company of St. Louis was incorporated with a capital stock of $100,000,which was subsequently increased to $40,000,000, and on July 10, 1899, its name was changed from ''Central Traction Company'' to United Railways Company of St. Louis.''

The St. Louis Transit Company was incorporated on March 2, 1899, with a capital stock of $3000, later increased to $20,000,000.

Each of these companies had a board of directors of eleven members, consisting, with one or two exceptions, of the same persons, and the officers of both were the same. Murray Carleton became president of the United Railways Company in 1899, and of the Transit Company in April, 1901, and continued as such until March, 1905. According to his evidence ''the controlling interest in these two companies was vested in the men that represented them in an official way.''

Prior to the 30th day of September, 1899, the United Railways Company had acquired control of all of the street car lines in the City of St. Louis, excepting one; comprising about two hundred and ninety-three miles of track. The Transit Company had no property. On the 30th day of September, 1899, the following contract of lease was entered into between the two companies:

## CONTRACT OF LEASE BETWEEN UNITED RAILWAYS OF ST. LOUIS AND ST. LOUIS TRANSIT COMPANY.

"This Agreement, made and entered into between the United Railway Company of St. Louis, hereinafter called 'United Railways,' a corporation duly organized and existing under the laws of the State of Missouri, party of the first part, and the St. Louis Transit Company, hereinafter called 'Transit Company,' also a corporation duly organized and existing under the laws of the State of Missouri, party of the second part, witnesseth that

"Whereas, 'United Railways' is the owner of several lines of railway in the city and county of St. Louis, in the State of Missouri, and of certain bonds and stocks more specifically described in a certain deed of trust to the St. Louis Trust Company bearing date September 20, A. D., 1899, and is willing to lease all of its said lines of railway lying and being situate in the city and county of St. Louis, including all the property and franchises appurtenant thereto, together with all income to be derived from said bonds and stocks, to 'Transit Company' for the period beginning on the first day of October, A. D. 1899, and ending on the first day of April, A. D., 1939. upon the terms and conditions hereinafter stated; and

"Whereas, 'Transit Company' is desirous of acquiring the said lines of railway including all the property and franchises appurtenant thereto, together with any and all income derived from the ownership of the bonds and stocks now owned by 'United Railways,' or which it may hereafter acquire during the term of this lease.

"Now, therefore, this Agreement Witnesseth, That 'United Railways,' for and in consideration of the covenants and agreements hereinafter contained on the part of 'Transit Company' to be by it made, kept and performed, has granted, demised and leased, and by these presents does grant, demise and lease, unto 'Transit Company' all of the railways now constructed, owned or operated by it, or which may be hereafter constructed, owned or operated by it, and all its right, title and estate in and to all its property, real, personal and mixed, now held by it, as owner or otherwise, with all franchises of every sort and kind, to it now belonging, or which it may hereafter acquire, as fully as it now holds, or owns, or may acquire the same, together with all income derived from any bonds or stocks now owned by 'United Railways,' or which may be hereafter acquired by it, provided always, however, that nothing herein contained shall operate to grant or demise, or be construed to include, the franchise to be a corporation heretofore granted to the said party of the first part, or any other right, privilege or franchise, which is, or may be, necessary to preserve the corporate existence or organization of the party of the first part under its charter, and all the rights, privileges and franchises last aforesaid are hereby expressly reserved and excepted from these presents,

"To Have and to Hold the said demised property, real, personal and mixed, with the franchises unto 'Transit Company,' its successors and assigns, for the full term from the first day of October, A. D., 1899, until the first day of April, A. D., 1939.

"On consideration of the premises, 'United Railways' covenants and agrees that 'Transit Company,' its successors and assigns, shall, at all times during the term aforesaid, have full and exclusive power, right and authority to use, manage and operate said railways of 'United Railways' and shall have the right to fix the tolls thereon, but not at a higher rate than 'United Railways' is authorized so to do; and, further, that 'Transit Company' shall have the full, free and exclusive right to charge and collect all of the tolls to accrue from the railways of the 'United Railways' during the said term and appropriate the same to its own use, and shall have, use and exercise all the rights, powers and authorities aforesaid, and all other lawful powers and privileges which can be lawfully exercised and enjoyed on or about the said demised railways, properties, franchises and premises, as exclusively, fully, amply and entirely as the same might or could have been used by 'United Railways' had this lease and contract not been made.

"And in consideration of the premises 'Transit Company' has agreed, and does by these presents agree, to and with 'United Railways' as follows, to-wit:

"1. That is, 'Transit Company,' shall and will during the continuance of this lease, at its own proper cost, and expense, and without deduction from the rent herein provided to be paid, maintain, operate, work, use and run, and keep in public use the said demised railways in the same manner as 'United Railways,' as the owner or lessor thereof, is now, or at any time hereafter, may be required to do. And 'Transit Company' shall and will, at its own proper cost and expense and without deduction from the rent herein provided to be paid, at all times, during the continuance of this lease, maintain, operate and keep the railways, property and premises hereby demised, and every part of the same, in good repair, working order and condition, and supplied with rolling stock and equipment, so that the business of said demised railways shall be increased and developed. And 'Transit Company' hereby agrees and promises to and with 'Railway Company,' that it, 'Transit Company,' shall and will, at its own proper cost and expense, and without deduction from the rent aforesaid, from time to time, during the term aforesaid do, or cause to be done, to and upon the said demised railways, and premises, any and all repairs and replacements and any and all additions thereon, and improvements which may be reasonably required for the purposes aforesaid, and provide thereon such new and additional rolling stock, equipments and other appliances as shall and may be reasonably required for the purposes aforesaid; and 'Transit Company' shall and will use all reasonable efforts to maintain, develop and increase all the business of the railways hereby demised.

" 'Transit Company' shall and will keep a complete and accurate record of all additions, acquisitions, betterments and improvements made by it upon said demised premises and property and the amounts of money expended therefor and shall, from time to time, file the same with 'Railways Company,' and, thereupon, when requested by resolution of the board of directors of 'Transit Company,' 'Railways Company' will deliver to 'Transit Company,' or its order, any of its unissued first general mortgage bonds at par in payment for the money so expended, which it would be authorized to use for the same purpose under the terms and conditions of the mortgage securing said bonds; or in payment for said sums of money so expended by 'Transit Company,' 'Railways Company' will deliver at par, when requested, as aforesaid, to 'Transit Company' any of its unissued preferred or common stock.

"And 'Transit Company' will indemnify, save and keep harmless during the continuance of this lease, 'United Railways' from all costs, charges and expenses arising from the management and operation of said railways, and all matters incident thereto.

"2. That 'Transit Company' shall pay to 'Railways' a net annual rental of five dollars per share  upon all the preferred stock of 'Railways Company' now outstanding or which may hereafter be issued by 'Railways Company' with. the  consent of 'Transit Company.'  Said rental shall be payable quarterly on the. 10th days of January, April, July and October during each and every year thereafter for the full period of this lease, provided, however, that the first quarterly payment shall be made on the 10th day of April, 1900.  Payments of the rental herein provided for  shall be made at the office of the 'Transit Company' in the City of St. Louis, or at the agency of the 'Transit Company' in the City of New York, either or both, as 'Transit Company' shall, from time to time determine.

"3. That in addition to the rental provided to be paid by 'Transit Company' in paragraph two of this lease, 'Transit Company' shall pay to the 'United Railways' the further sum of one thousand dollars per annum, for the purpose of defraying the expense of maintaining the corporate existence of the railway and traction companies connected with, or interested in, the properties and franchises herein mentioned, which sums shall be paid semi-annually in equal installments at the times and at the place or places hereinabove provided for the payment of the rental.

"4.  That in addition to the amounts hereinbefore provided to be paid by 'Transit Company' to 'United Railways' in paragraphs two and three hereof, 'Transit Company' hereby assumes and agrees to pay all of the floating debts of 'United Railways' when and wherever the same may become due and payable.

"5. That 'Transit Company' shall and will also, during the continuance of this lease, pay all taxes and assessments and water rents which may be assessed upon the real estate, personal property, franchises, capital stock, business rental, income, dividends and indebted-

ness of 'United Railways,' or any of the lines of railway or property leased or operated by it.

"6. That 'Transit Company' shall and will also pay the interest accrued and to accrue, as the same becomes respectively due and payable, on all the bonds heretofore issued, and now outstanding, by 'Railways Company,' or any of the subordinate companies whose property and franchises 'Railway Company' has acquired, said bonds being as follows: . . . .

"7. That 'Transit. Company' shall and will, at all times, keep the property of the 'Railways Company' insured against loss by fire, paying the premiums therefor from its own funds, and will, at the expiration of this lease and contract, yield and deliver up the hereby demised railways and properties and their appurtances, in the same good order and repair as the same are now in, or may be put in during the hereby demised term (reasonable wear and tear excepted), excepting any property sold in accordance with this agreement and contract.

"8. That 'Transit Company' shall and will during the continuance of this lease apply all net surplus earned by it over and above the six per cent annual dividend upon the $20,000,000 of capital stock, which 'Transit Company' is now authorized to issue, or so much thereof as may from time to time be outstanding, to the betterment, improvement, or extension of the property or railway lines now owned or which may hereafter be acquired, by 'Railways Company,' or to the redemption, payment or retirement of the mortgage indebtedness of 'Railways Company' or of its subordinate companies. In case 'Transit Company' shall purchase out of said surplus earnings any of the underlying bonds issued by any of the subordinate companies, whose property, franchises or stock has been acquired by 'Railways Company,' 'Transit Company' shall have the same right to use the First General Mortgage four per cent bonds, which 'Railways Company,' under its mortgage, is authorized to receive in exchange for said underlying bonds of said subordinate companies, in the same manner and to the same extent as 'Railways Company' would have the right under said mortgage to use the same, and 'Railways Company' shall and will do all things requisite or necessary on its part to be done to carry this provision into full force and effect.

"9. That 'Transit Company' shall and will apply all moneys received by it from 'Railways Company' at the time that this lease goes into effect, save and except what may be necessary to meet current liabilities, including interest accrued upon all mortgage indebtedness, to the improvement of the premises hereby demised, and shall make like disposition of all moneys that 'Transit Company' may subsequently receive from 'Railways Company' through the sale of property that may become useless in the conduct of the business of 'Railways Company;' and 'Railways Company' shall and will turn over to 'Transit Company' all moneys of every character in its possession, or to which

it may be entitled, at the time that this Indenture goes into effect, and all other moneys that it may subsequently become possessed of from any source whatever during the term of this lease.

"10.    That it is the purpose and understanding of the parties hereto that these presents shall go into effect immediately upon their execution and delivery, and all the rights and liabilities of the parties hereto, as herein assumed, covenanted for and agreed to, shall, upon due execution and delivery hereof, become fixed and ascertained, 'United Railways' turning over all assets of every character to 'Transit Company,' and 'Transit Company' assuming all liabilities of every character of 'United Railways.'

"11.    That 'United Railways'. shall and will, during the term of this contract, maintain its corporate existence and organization, and at all times, from time to time, during the said term and, when requested by 'Transit Company,' its successors or assigns, shall and will put in force and exercise each and every right, and do each and every corporate act, which it may now, or at any time hereafter, lawfully put in force, or exercise, to enable 'Transit Company' to enjoy and avail itself of every right, franchise and privilege in respect to the use, management, renewal, extension or improvement of the premises herein described, or intended so to be, or the business to be carried on, 'Transit Company' agreeing to indemnify and save harmless 'United Railways' against all expense, loss, damage or liability for such exercise of corporate power or performance of corporate acts when exercised or done at the request of 'Transit Company.'

"12.    That in case 'Transit Company,' its successors or assigns, shall, at any time or times hereafter, during the continuance of this lease fail, or omit to pay, as the same becomes due and payable, the interest due upon any of the bonded indebtedness recited in section six of this lease, or in case 'Transit Company,' its successors or assigns, shall fail or omit to pay the floating indebtedness hereinbefore mentioned and provided to be paid by 'Transit Company,' its successors or assigns, or any part thereof, when the same shall become due and payable, as hereinbefore specified, then immediately upon the happening of such event, it shall be lawful for 'United Railways,' at its option, to treat this lease as forfeited; or in case 'Transit Company,' its successors or assigns, shall fail or omit to keep and perform the covenants and agreements herein contained, or any of them, and shall continue in default in respect to the performance of such covenants or agreements for the period of sixty days, then and in either and every such case it shall be lawful for 'United Railways,' its successors or assigns, to treat this lease as forfeited; and in case 'United Railways' shall, for any such cause, decide to treat the lease as forfeited, it shall be lawful for 'United Railways,' its successors  or assigns, at its own option, to enter at once upon the railways and premises hereinbefore demised, and along and upon every part thereof, and remove all persons therefrom, and from thenceforth the said demised

railways and premises, with the equipments and appurtenances thereof, to have, hold, possess and enjoy as of the first or former estate of 'United Railways' in the said demised premises, and upon such entry for non-payment of the interest on the bonded indebtedness as above provided, or for non-payment of the floating indebtedness as herein provided, for non-payment of rent, or breach, or non-performance of any covenant or agreement therein contained to be by 'Transit Company,' its successors or assigns, observed or performed, all the estate, right, title, interest, property, possession, claim and demand whatsoever of 'Transit Company' its successors or assigns, in or. to the addition and improvements above mentioned, and in or to the same demised railways and premises, or either, or any part of them, as well as all the right, title and interest of 'Transit Company,' its successors or assigns, in, under or by virtue of this lease, shall wholly and absolutely cease, terminate and become void, anything hereinbefore contained to the contrary in anywise notwithstanding.

"And in case of the re-entry aforesaid, the floating indebtedness, interest and rent provided herein to be paid, shall, up to and until the date of re-entry be deemed and taken as due and payable, and the same shall be paid by 'Transit Company,' its successors and assigns. And it is further declared and agreed that such re-entry shall not waive or prejudice any claim on right of 'Railways Company,' its successors or assigns, for damages against 'Transit Company,' its successors and assigns, on account of such non-performance or breach of any of the terms of this lease; and all such claims and rights are hereby expressly preserved to the said 'Railway Company,' its successors or assigns.

"13.    That all cars, machinery, tools, appliances, etc., generally called personal property, of every sort and kind, belonging to 'United Railways,' or held by it as lessee, shall, when this lease goes into effect, be delivered to 'Transit Company:' The same shall be valued by mutual agreement, and, in case said parties cannot agree as to the value, then by appraisers to be appointed in the manner hereinafter provided. In case of the termination of this lease and contract for any cause, 'Transit Company' shall return the said property as inventoried and appraised in as good order and condition as when received, or the equivalent thereof, or pay the amount of such valuation to 'United Railways,' with interest from the date of the termination of this lease.

"14.    Upon the termination of this lease, for any cause, arising from breach of covenant by 'Transit Company,' all such property necessary to the operation of the lines of 'United Railways,' as enumerated in Section 13 of this agreement, and all betterments to the property that may be made by 'Transit Company,' by which is meant all cars, tools, tracks, rails, roadbeds, wires, poles, motors and appliances that may by 'Transit Company' be put upon the lines and

property of 'United Railways,' and necessary to the operation of the said road, shall become the property of 'United Railways.'

"15. That 'Transit Company' shall, at all times, keep at its office in the City of St. Louis full, true and just accounts of any and all moneys received and business done upon the said demised railways, and of all moneys paid, laid out and expended, and liabilities incurred, in connection with the same. The accounts to be kept by 'Transit Company,' as above provided, and any and all accounts which shall, and may be kept, in relation to the said demised railways, or the business of the same, shall, at all reasonable hours and times during the continuation of this lease, be open to the inspection and examination of the President of 'United Railways,' and such other person or persons as 'United Railways' shall, from time to time, by resolution of its board of directors, appoint to examine the same.

"16. That all differences which may arise between the parties hereto, at any time hereafter, as to the construction of this agreement, or as to the due performance of any covenant herein contained, or as to the value of any property to be allowed by either to the other, shall be conclusively settled by the decision of three arbitrators, or by a majority of them in case of disagreement; such arbitrators to be chosen in the manner following, to-wit:

"'Railways Company' shall select one of the arbitrators and 'Transit Company' shall select one, and the two thus chosen shall select a third. In case either party shall fail to select an arbitrator for the period of ten days, after a request in writing delivered to the president, then the arbitrator appointed by the party not in default shall select an arbitrator for the defaulting party, and these two shall proceed as herein provided in case of the selection by each party.

"17. That all the terms and covenants of this lease and agreement shall bind the parties, their respective successors and assigns; it being intended that the benefits of all covenants shall accrue to successors and assigns, as well as to the original parties, and that performance shall be by successors and assigns as well as by original parties.

"18. That 'Railways Company' covenants and agrees from time to time to make any further deed or indenture to carry out these presents that 'Transit Company' may reasonably demand.

"This contract and lease is made and executed in pursuance of a resolution of the stockholders of the United Railways Company of St. Louis, passed at meeting held on the twentieth day of September, A. D., 1899, and of the board of directors of said company held on the twentieth day of September, A. D., 1899; and a resolution of the stockholders of the St. Louis Transit Company passed at a meeting held on the twenty-first day of September, A. D., 1899, and of the board of directors of said company held on the twenty-first day of September, A. D., 1899.

"In Witness Whereof, The United Railways Company of St. Louis, party of the first part, has caused these presents to be signed in its name and behalf by its president, and its corporate seal to be hereunto affixed, attested by its secretary, and the said St. Louis Transit Company, party of the second part, has caused these presents to be signed in its name and behalf by its president, and its corporate seal to be hereto affixed, attested by its secretary, this thirtieth day of September, A. D., 1899.

"UNITED RAILWAYS COMPANY OF ST. LOUIS.

"(Seal)                         By EDWARD WHITAKER, President.

"Attest:

"JAMES ADKINS, Secretary.

ST. LOUIS TRANSIT COMPANY,

"(Seal)                         By EDWARD WHITAKER, President.

"Attest:

"ALBERT H. BAUER, Secretary.

After the execution of this lease the United Railways Company became inactive and did nothing more than maintain its corporate existence. Its entire railroad property was taken over by the Transit Company and operated under the lease until midnight of October 31, 1904, when the United Railways Company again took charge and the Transit Company disappeared from the scene. During this period of time, between June 3d, 1901, and February ——, 1904, the suits were brought in which the judgments sued on were obtained against the Transit Company.

When the Transit Company began operations 172,613 shares of its common stock were exchanged for a like number of shares of the common stock of the United Railways Company and $10 per share in cash, and in this manner it obtained a working capital of about $1,900,000.

At the end of five years of its operation of the street car lines, September 30, 1904, its financial condition was as follows, according to a statement prepared by its auditor:

ST. LOUIS TRANSIT COMPANY.

Balance Sheet—September 30, 1904

**LIABILITIES.**

CAPITAL STOCK—

172,643 shares, par value $100.00 ..................... 17,264,300.00

Johnson v. United Rys.

St. Louis Transit Company 3 year 5 per cent
  Collateral Trust Notes, 5,776 Notes, par
  value, $1,000 .........................................5,776,000.00
St. Louis Transit Company Refunding and
  Improvement 5 per cent Gold Bonds, 8,000
  Bonds, par value, $1,000.00 .........................  8,000,000.00

CURRENT LIABILITIES—

Bill payable .............................. $818,202.00
Audited vouchers ..........................  413,323.94
Unclaimed wages ..........................    9,245.60
Trust Fund Certificates—Employes' Savings
  Deposits ................................    6,295.00
Bond Coupons due and unpaid ..............  340,740.00
Dividends accrued on Preferred Capital stock
  of the United Railways Company .........  249,790.00
Employes' badge and punch deposits ........      289.65
Southern Railway Company First Mortgage
  Bonds of 1884, due and unpaid ...........    2,000.00
Due to individuals and companies schedule "B"     110.00

    Total Current Liabilities ...............       $1,839,996.19

DEFERRED LIABILITIES—

Interest Accrued—Not Due:
  United Railways Company Funded Debt .... $499,644.98
  Collateral Trust Notes ...................  120,333.34
  Miscellaneous interest accrued ...........    8,139.19
  Rental of Track and Terminals, accrued ....    1,200.00
  Organization expense of the United Railways
  Company of St. Louis, accrued ...........       89.90
  Reserve fund for personal damages, accrued    5,566.90
Outstanding Tickets:
  Old Series .................... $19,454.66
  New Series ....................  18,147.83  37,602.49

    Total deferred liabilities ......................        672,576.80

PROFITS AND LOSS—

Loss, December 31, 1903 ................... $511,249.99
Profit for Current year ...................  766,812.86   255,562.87

    Total liabilities ....................      $33,808,435.86

### ASSETS.

SECURITIES—

United Railways Company of St. Louis First
  Mortgage Bonds, 2877 bonds, par value ......
  $1,000.00 .............................. $2,852,158.72
United Railways preferred stock, 82,273 shares,
  par value $100.00 ....................... 7,832,708.20

United Railways common stock, 172,613 shares,
  par value $100.00 ........................ 17,261,300.00
Louisiana   Purchase   Exposition   Co.   21,000
  shares par value $10.00 ................... 210,000.00
Securities due from United Railways Company
  of St. Louis at their par value for amounts
  expended for construction, betterments and
  improvements ............................   958,886.16
St. Louis Light Artillery Armory Association ..   2,500.00
                                           —————————
                                              $29,117,553.08

SUSPENSE ACCOUNT—
Losses sustained in sale of securities acquired
  under the lease of September 20, 1899, also
  commission and expenses negotiating loans
  to raise funds to pay for amounts expended
  for construction, betterments and improve-
  ments:
United Railways Company 4 per cent bonds,
  par value $1,000, 2,500 bonds, net proceeds,
  $2,225,000.  Loss  ........................  275,000.00
St. Louis Transit Company collateral trust
  notes, par value $1,000, 5,776 notes, net pro-
  ceeds, $5,417,691.79.  Loss ................  358,308.21
Commission on loan of $3,500,000.00 at 2½ per
  cent commission ........................   87,500.00
Compensation in connection with the Transit
  Company refunding and improvement bonds    10,000.00
Expenses for printing in connection with Trans-
  it Company refunding and improvement
  bonds, etc. ..............................    8,880.00
St. Louis Transit Company 5 per cent refund-
  ing   and   improvement   bonds,   par   value
  $1,000, 8,000 bonds, net proceeds $5,985,000.
  Loss ................ ... ................ 2,015,000.00
                                           —————————
                                              2,754,688.21

CONTRA—
For loss on sale of United Railways Company
  4 per cent bonds used for refunding, under-
  lying liens charged to United Railways Co.,
  292 bonds, par value, $1,000, net proceeds
  $259,880.00.   Loss  ........................  32,120.00
                                           —————————
                                              $ 2,722,568.21
        Carried  forward  ...................   $31,840,121.29

MATERIALS AND SUPPLIES—
General supplies ...........................$286,904.91
Frog shop manufacturing dept. ..............   2,596.08
Oil manufacturing dept. .....................   1,456.07
Brass foundry .............................   5,158.21

    Total materials and supplies .................$ 296,115.27

CURRENT ASSETS—
Cash ...................... ... ...........$ 713,435.73
Cash on deposit to pay bond coupons.......  355,450.00
Cash on deposit for the redemption to People's
  Railway first and second mortgage bonds and
  interest ............................ . ...........     60.00
Due from individuals and companies ..........  11,505.01
Bills collectable ............................  53,093.78
Bills receiveable ...........................  88,431.73
Due from the United States Government, P.
  O. Dept. ...............................,.......   8,611.12
City of St. Louis ..........................   4,407.33
Interest accrued on securities owned..........  28,770.00
Dividends accrued on securities owned ...... 102,841.25
The Fidelity & Casualty Co. of N. Y. ..........  75,000.00
Fidelity Trust Company of Louisville, Ky., for
  redemption of Southern Railway Company,
  first mortgage bonds of 1884 ...............   2,075.00
Conductors' remittances ....................      32.20

    Total current assets .........................$1,443,713.15

DEFERRED ASSETS—
Special jury deposits .......................$     75.00
Insurance paid in advance ..................  38,618.72
Water Taxes paid in advance ...............       7.50
Indemnity insurance paid in advance ........     753.50
General expenses paid in advance ...........   3,195.75
Rent on land and buildings ..................     444.99
Taxes paid in advance .....................  87,560.95
Conductors' and Motormen's bonus, paid in
  advance .............................. . ............   4,211.46
Boiler explosion, Union Depot power station....  10,815.73
World's Fair terminals .....................  82,802.55

    Total deferred assets .................        $   228,486.15

    Total assets .................. .. ....°..        $33,808,435.86

    I hereby certify that the above statement of assets and liabilities agrees with the books of the St. Louis Transit Company as of September 30th, 1904, and is correct.

                        FRANK R. HENRY.
            Auditor, St. Louis Transit Company.

Among the liabilities, here listed, the $5,776,000 collateral trust notes matured on November 1, 1904. After unsuccessful efforts to provide the means to meet these obligations at maturity, the president of the Transit Company on the 9th day of September, 1904, made the following proposition to the Mercantile Trust Company, which held, as trustee, the stocks and bonds pledged as collateral:

"St. Louis, Mo., Sept. 9, 1904.
"To the Mercantile Trust Company, St. Louis, Mo.

"The St. Louis Transit Company submits for your acceptance the following proposition, which upon acceptance by you shall constitute a binding contract between the Transit Company and the Trust Company, as Syndicate Manager and as Trustee under the Collateral Trust Agreement of the Transit Company, dated November 30, 1901, and as Trustee under the Indenture of Trust between the Transit Company and the Trust Company, dated June 17, 1903, and the Syndicate Manager under an agreement dated February 12, 1904, and the several subscribers to said Syndicate Agreement; first, to authorize the issue of a new and valid series of twenty-year Improvement Bonds to be dated October 1, 1904, with five per cent semi-annual interest coupons attached, payable principal and interest at the Mercantile Trust Company, St. Louis, Mo. The form of the bonds to be substantially the same as those secured by the Indenture of Trust dated June 17, 1903.

"The payment of principal and interest of the new series of Improvement Bonds shall be guaranteed by the United Railways Company in the same form as the bonds secured by the Indenture of Trust dated June 17, 1903, and the guaranty of the United Railways Company shall be secured by a mortgage of that company in due form and legally authorized, covering the same property described in the first general mortgage of said company, dated September 20, 1899, thus constituting a second mortgage on all the property of the United Railways Company.

"2. When the new issue of $10,000,000 of improvement bonds and the guarantee thereof and of the execution of the mortgage securing such guarantee, by the United Railways Company, shall have been duly and legally authorized, and when the written consent of this agreement within the time herein specified shall have been signed by all the holders of the $8,000,000 of Improvement and Refunding Mortgage Bonds heretofore sold by the Transit Company, it shall be the duty of the Mercantile Trust Company as trustee under said Indenture of Trust dated June 17, 1903, upon the payment to it of the consideration specified in paragraph third, which payment must be made on or

before the 1st day of November, 1904, and upon the delivery to it as an interim form or otherwise, of $8,000,000 of new Improvement Bonds, said delivery being made for the purpose of exchanging the same for $8,000,000 of Refunding Bonds heretofore sold, and to release and deliver possession of all the bonds and stock pledged with it as security under both of said indentures of mortgage, and to satisfy the latter of record.

"3. The Transit Company agrees on or before the 25th day of October, 1904, to procure execution by a purchase of an agreement to buy from it $2,000,000 of the new Improvement Bonds at not less than 85 net to it, and also of so many of the securities held by the Mercantile Trust Company as collateral under said two Indentures of Mortgage as will be necessary to provide for the principal of the notes due November 1, 1904, and for certain requirements aggregating $935,000. Said requirements being for paving, $205,000; for writing down certain assets, $379,000, and for $361,000 current liabilities, unprovided for in the sale of $8,000,000. Refunding and Improvement Bonds.

"The Transit Company further agrees that out of the proceeds of sale of said securities and of the $2,000,000 of new Improvement Bonds and otherwise cash to the extent of $5,776,000 shall on or before the 1st day of November, 1904, be paid to the Mercantile Trust Company as trustee, upon the surrender of all the securities held by said Trust Company, under both Indentures of Mortgage to the purchasers thereof, accompanied by satisfactions of record of both of said indentures; said Trust Company shall apply the proceeds (not being required to advance any money of its own in the premises) to the payment of the outstanding Collateral Trust Notes of the Transit Company secured by the Collateral Trust Agreement of November 30, 1901; said Collateral Trust Notes as paid to be cancelled by the Trust Company.

"4. Upon the execution of the New Improvement Bonds above mentioned the same shall be delivered to the Trust Company and it shall have the right and authority to exchange the same dollar for dollar at par, for the Refunding and Improvement Bonds dated April 30, 1903, now outstanding, and amounting in the aggregate to $8,000,-000, the interest on each series to be properly adjusted as that of November 1, 1904. The balance of the issue, namely, $2,000,000 are to be certified and held by the trustee for delivery to the purchaser as specified in pararaph third of this agreement, on payment of $1,700,-000, part of $5,776,000. The funds so received to be applied by the trustee on account of the $5,776,000 above mentioned, and toward the payment of the five per cent Collateral Trust Notes due November 1, 1904; and upon such exchange being made all the bonds dated April 1, 1903, so exchanged, as well as all of the remainder of said bonds amounting to $12,000,000 shall be cancelled by the trustee and the new bonds received by the Mercantile Trust Company in exchange for said old Refunding and Improvement Bonds to the extent of $8,000,000 shall be held by the trustee for the benefit, according to their re-

spective interests, of the subscribers to the Syndicate Agreement of February 12, 1904, and the extensions thereof.

"5. It is understood as part of this agreement that neither of the parties hereto shall be bound unless the holders of $8,000,000 of Refunding and Improvement Bonds shall consent hereto in writing on or before the 21st day of September, 1904, to the exchange of said bonds as is herein provided; nor unless the new Improvement Mort-gage shall be duly authorized by the stockholders of the St. Louis Transit Company and United Railways Company at their meetings to be held respectively on October 19th and October 20th, 1904; nor unless the securities above mentioned shall be sold before October 25, 1904, as specified in paragraph third of this agreement. In case of the failure in the performance of any of said conditions at the times respectively set forth, and time shall be of the essence of con-tract, this proposition and the acceptance thereof shall be null and void.

"St. Louis Transit Company,
By...........President."

The board of directors ratified this contract at a meeting held on September 27, 1904, and adopted the following further resolution:

"Resolved that, subject to the conditions herein named, the presi-dent or vice-president of this company is hereby directed to execute the following proposed contract between this company, the United Railways Company of St. Louis and Brown Bros. & Co., as Syndicate Managers, viz.:

"This Agreement, made this, 'the 27th day of September, nineteen hundred and four, by and between the St. Louis Transit Company, a street railway corporation organized under the laws of the State of Missouri, party of the first part, and hereinafter called 'Transit Company,' and the United Railways Company of St. Louis, a street railway corporation organized under the laws of the State of Mis-souri, as party of the second part, and hereinafter called 'Railways Company,' and Brown Brothers & Company, a co-partnership of the City of New York, as Syndicate Managers, and hereinafter called 'Syndicate,' Witnesseth:

"That the said parties, under the conditions hereinafter stated, do severally contract with each other as follows:

"Under an indenture of lease dated September 30th, 1899, Rail-ways Company leased to Transit Company all of its property as there-in specified, and upon the covenants and conditions therein contained, for a term ending on the first day of April, 1939.

"In the operation of said property, and in making improvements, betterments and additions, thereon, as required by the terms of said lease, Transit Company has contracted the following note and bonded indebtedness, namely:

"(a)    Five million, seven hundred and seventy-six thousand dollars ($5,776,000) par value three-year 5 per cent Collateral Trust Notes, due November 1st, 1904, which notes are secured by a deposit with the Mercantile Trust  Company of St. Louis, under a Collateral Trust Agreement bearing date November 30th, 1901, of the following securities, viz.:

"Two million, eight hundred and seventy-seven thousand dollars (2,877,000) par value United Railways 4 per cent General Bonds.

"Four million, eight hundred and ninety-three thousand, five hundred dollars ($4,893,500) par value United Railways 5 per cent preferred stock.

·    "(b) Eight million dollars ($8,000,000) 5 per cent twenty-year gold bonds of a total authorized issue of $20,000,000, secured by an Indenture of Trust between Transit Company and the Mercantile Trust Company of St. Louis, dated the 17th day of June, 1903; which bonds are secured by a pledge of the bonds and stocks deposited under the Collateral Trust Agreement aforesaid, and subject thereto, and a further deposit of $3,329,700 par value of the preferred stock of the United Railways Company of St. Louis, and $17,261,300 par value of the Common Stock of the United Railways Company of St. Louis, and a mortgage upon its lease-hold from the United Railways Company as aforesaid, together with the guaranty of the United Railways Company of St. Louis.

"(c) Transit Company has further specific indebtedness, as shown upon August 31st, 1904, of $1,665,155.17, but which it is estimated the surplus earnings of 1904 will reduce to $935,000.

"Transit Company is unable to meet the said indebtedness of $5,-776,000 to fall due on November 1st, 1904, as aforesaid, and to pay the said specifically estimated indebtedness of $935,000 shortly thereafter to mature except by the sale of the collaterals deposited under the two above recited agreements with the Mercantile Trust Company of St. Louis, and these collaterals it cannot dispose of without procuring a release thereof from the aforesaid pledges, and from the right of substitution which the United Railways Company has by reasons of the terms of its guarantee and the trust instrument under which said collaterals are pledged.

"In order, therefore, to procure a release of said securities and to pay its indebtedness as aforesaid, it proposes to make an issue of 5 per cent twenty-year gold bonds, to be called 'Improvement Bonds,' in the aggregate amount of ten million dollars and to obtain the guaranty of Railways Company thereon, secured by a mortgage of the Railways Company upon all of its property, only subject to the lien of the mortgages already existing.

"Article I.

"Transit Company and Railways Company agree as follows:

"1.    Transit Company agrees, whenever requested by Railways

8—281 Mo.

Company so to do, that it will surrender to Railways Company, by proper instruments or conveyance of release, all and singular the property demised by the aforesaid lease of September 30th, 1899, and deliver, assign and transfer to Railways Company, upon such request, the immediate possession of all the said demised property, and all cash, bills receivable or other credits then owned or held by it, for and upon the considerations and conditions hereinafter named; Provided, only that Railways Company, at the time of said request, shall release and fully acquit Transit Company from all liability which then had or may thereafter accrue to Railways Company under or by virtue of any of the terms or covenants of said lease.

"2.     Transit Company further agrees that it will cause the $8,000,000 now outstanding of its Refunding and Improvement Bonds, together with all the unissued bonds of the total authorized issue of twenty million dollars of its said Refunding and Improvement Bonds, to be cancelled, and the Indenture of Trust of June 17th, 1903, to be released and discharged. That it will cause the holders of the eight million dollars of outstanding Refunding and Improvement Bonds to agree to exchange the same at par for a like amount at par of its proposed Improvement Bonds, to be guaranteed as hereinbefore stated, by Railways Company.

"3.     That it will enter into an agreement as hereinafter stated, with Syndicate, for the sale of all the bonds and stocks deposited with the Mercantile Trust Company of St. Louis under the Collateral Trust Agreement of November 30th, 1901, and the Indenture of Trust of June 17th, 1903, together with the two million dollars of the proposed Improvement Bonds which remain after the exchange of $8,000,000 thereof for the $8,000,000 of the outstanding Refunding and Improvement Bonds.

"That in and by such sale to Syndicate as hereinafter stated Transit Company shall provide that seven million dollars of preferred stock of Railways Company shall be deposited for the use and benefit of Railways Company, upon terms and subject to restrictions to be agreed upon herein between Railways Company and Syndicate.

"4.     Railways Company agrees, subject to the approval of the legal majority of its stockholders, to guarantee, said proposed issue of ten million dollars of Improvement Bonds, and to secure its said guarantee thereof by a deed of trust or mortgage upon all of its property, subject only to the mortgage liens already existing thereon.

"Article II.

"1.     Transit Company agrees with Syndicate as follows:

"To sell, assign and transfer to Syndicate two million dollars of its proposed Improvement Bonds at eighty-five cents on the dollar (or $1,700,000 and $8,227,300 par value of the preferred stock of the United Railways Company of St. Louis, and $2,877,000 par value of the 4 per cent general mortgage bonds of the United Railways Company of

St. Louis, and $17,261,300 par value of the common stock of the United Railways Company of St. Louis, for and in consideration of the sum of $5,300,000 aggregating the sum of $7,000,000, of which sum $6,711,000 shall be paid at the time, upon the terms and conditions and for the uses and purposes specified in a contract between the Mercantile Trust Company as Syndicate Manager and as Trustee, and Transit Company, bearing date of September 9th, 1904.    The remainder, viz., $289,000 shall be paid upon the order of Transit Company or its president.

"2.    Syndicate agrees to pay for the said bonds and stocks the amount so specified, at the ,dates and upon the terms and conditions specified in the next preceding˜paragraph.

"Syndicate further agrees to cause seven million dollars of the preferred stock of Railways Company so to be acquired by it, to be deposited with a trustee for the use and benefit of United Railways Company, upon the terms and covenants hereinafter made between Syndicate and Railways Company.

"Article III.

"Railways Company and Syndicate agree as follows:

"(a) Railways Company has in its treasury, unappropriated and unissued, shares of common stock of the par value of $7,652,500.    In consideration of the purchase by Syndicate of the stocks and bonds as herein agreed upon between Transit Company and Syndicate, and the agreement to deposit with The National Bank of Commerce in St. Louis, as trustee, for the use and benefit of Railways Company, pre· ferred shares of stock of Railways Company aggregating the total par value of seven million dollars and the agreement of Syndicate to offer to procure for Railways Company, as hereinafter stated, shares of stock of the Transit Company, Railways Company hereby agrees to· sell, for the consideration aforesaid and other considerations herein mentioned, and to issue to Syndicate the said shares of common stock of Railways Company aggregating the par value of $7,652,500; and

"(b) Railways Company further agrees, whenever thereto re- quested by Syndicate, to demand of Transit Company the surrender of the leasehold and the demised property leased to it under an Indenture of Lease dated September 30th, 1899, as hereinbefore agreed between Railways Company and Transit Company, and immdiately upon such surrender, as therein provided, to enter into and upon the premises and the operation of said property, and coincident therewith as be- tween it and Transit Company, to assume the payment of the ten million ·dollars of proposed Improvement Bonds guaranteed, as herein provided by Railways Company, and all debts then contracted for labor, materials or supplies rendered or furnished to Transit Company.

"(c) Syndicate agrees that it will purchase, upon the terms and conditions hereinbefore stated in Article II, the bonds and stocks then agreed to be sold and purchased, and, immediately upon coming into possession thereof, it will deposit with the National Bank of Commerce

of St. Louis, Trustee, preferred stock of Railways Company, of the aggregate par value of seven million dollars so purchased for the use and benefit of Railways Company; which stock, or any part thereof, so deposited with said trustee, shall be sold for the use and benefit of Railways Company by said trustee, whenever requested by Railways Company, at such price and upon such terms as Railways may direct.

"(d) Syndicate further agrees that of the common stock of Railways so purchased as aforesaid from Railways Company, it will offer to the share-holders of Transit Company, until the 18th day of October, 1904, voting trust certificates, issued under and by virtue of such a voting trust agreement as Syndicate may organize and make, representing two shares of the said common stock for five shares of the Transit Company Stock, provided said shareholders of Transit Company shall deposit their stock under terms and conditions prescribed by Syndicate for the purpose of such exchange, and upon the basis aforesaid, with The National Bank of Commerce in St. Louis, as agent for Syndicate, on or before said 18th day of October, 1904; and such Transit shares as shall be so exchanged shall be and become the property of Railways Company and be transferred to its treasury. All shares of Railways Company's common stock not so exchanged for Transit stock within said period shall be and remain thereafter the property of Syndicate. Syndicate, however of its own volition, but without any obligation so to do, may thereafter continue to exchange said stock upon said basis, and, should it do so, whatever shares of Transit Company stock Syndicate acquires by such exchange shall become the property of Railways Company.

"Article IV.

"The covenants between the respective parties hereto shall not be construed as inuring to the benefit or advantages of any person or corporation whose name is not subscribed to this agreement as a party thereto, and this agreement is conditioned upon the authorization by the shareholders of Transit Company of an issue of bonds aggregating ten million dollars at a meeting of the shareholders of said company called for October 19th, 1904, and the authority of the shareholders of the United Railways Company to guarantee the said issue of bonds of Transit Company, and to make a mortgage to secure said guarantee, at a meeting called for the 20th of October, 1904.

"In Witness Whereof, the United Railways Company of St. Louis and the St. Louis Transit Company have caused their corporate names to be hereto subscribed by their respective presidents, and attested by their respective secretaries, and Brown Brothers & Company, Managers, have affixed their firm signature hereto, the day and year first above written.

"United Railways Company of St. Louis,
"By C. H. Spencer,
"Vice-President.

"(Seal)

"Attest:
     "JAMES ADKINS,
          "Secretary

                              "ST. LOUIS TRANSIT COMPANY.
"(Seal)                            By MURRAY CARLETON,
                                               ᴠPresident.

"Attest:
     "JAMES ADKINS,
          "Secretary.

                                   "BROWN BROTHERS & Co.,
                                        "Syndicate Managers."

This contract is known and referred to as the Tripartite Agreement.

On the 27th day of September, 1904, Murray Carleton as president of the Transit Company, gave out the following letter:

                    "Office of the St. Louis Transit Company.
                              "St. Louis, September 27, 1904.
"To the Shareholders of the St. Louis Transit Company:

"On the 30th of September, 1899, your company entered into a contract of lease with the United Railways Company of St. Louis, by which it acquired, for a term of thirty years, the right to operate the properties of the lessor, and it immediately entered upon the operation of the property, pursuant to the terms of that lease.

"In making the improvements, betterments and additions to the demised property, as required by the covenants of the lease, the payment of rentals as therein provided for, and in the operation of the properties, it has contracted an indebtedness largely in excess of its available resources.

"In order to pay an indebtedness then due, on the first day of November, 1901, your company authorized an issue of $6,000,000 of three-year five per cent Collateral Trust Notes, secured by a pledge to the Mercantile Trust Company of St. Louis of $2,877,000 United Railways Company four per cent General Mortgage Bonds and 48,935 shares United Railways Company five per cent Preferred Stock, which it had acquired for betterments and improvements made upon the property under the terms of the lease aforesaid; $5,776,000 of these notes were issued and sold, and mature on November 1st, 1904

"The indebtedness of your company continued to increase, so that on June 17th, 1903, upon your advice, it was determined to issue $20,000,000 five per cent twenty-year Refunding and Improvement Bonds, for the purpose of paying the then existing indebtedness, provide for the payment of the above collateral notes, and create a resource for further improvements and betterments upon the leased property, which it had covenanted to make in the aforesaid lease.

"These bonds were to be secured by a deposit of the bonds and stock covered by the Collateral-Note pledge and 33,297 shares of preferred stock of the United Railways Company and 172,613 shares of the United Railways Company common stock, a mortgage of its leasehold, and the guaranty of the United Railways Company.

"By the terms of the Indenture of Trust securing the aforesaid issue of bonds, it was provided that $8,000,000 were to be immediately certified and delivered to your company. These bonds were delivered to your company and sold at the very best price obtainable; the proceeds of the sale, however, failed to meet all the financial requirements of your company.

"By the same instrument, it was provided that $6,056,000 par value of the bonds should be reserved to pay off and discharge the $5,776,000 of Collateral Trust Notes outstanding.

"Your company has been unable to sell the bonds so reserved, for an amount which will enable it to meet at maturity the Collateral Trust Notes, and has been unable to secure an exchange of the reserve bonds for the Collateral Trust Notes.

"Under those conditions the reserve bonds are unavailable and valueless to accomplish the purpose for which they were reserved.

"Your company is without financial resources, other than the bonds and stocks pledged as hereinbefore stated, with which to meet its indebtedness, and has no resources to make the improvements, additions and betterments required of it by the above lease.

"Your company proposes an issue of $10,000,000 of bonds, by your advice, to be guaranteed by the United Railways Company of St. Louis, and its guaranty secured by a mortgage upon all of its property, next in rank of lien to that of its general mortgage, for the purpose of exchanging $8,000,000 of the proposed issued at par for $8,000,000 outstanding of the authorized issue of $20,000,000 Refunding and Improvement Bonds, and to cancel all of the issued and unissued Refunding and Improvement Bonds, and release the Indenture of Trust securing the same, and thereby release the stocks and bonds pledged under the Refunding and Improvement Mortgage.

"The $2,000,000 of the proposed $10,000,000 bonds, together with the stocks and bonds released from the lien of the Refunding and Improvement Mortgage, and those remaining under the Collateral Trust Notes, will enable your company to contract with the United Railways Company for the guarantee of its proposed issue of $10,000,000 of bonds, and for a surrender of the lease (which has become more burdensome than your company can bear) and the sale of these securities to pay off its aforesaid Collateral Note indebtedness.

"To this end, it has made a conditional contract with the United Railways Company and with a Syndicate for the sale of these securities. The United Railways Company has, conditionally, contracted with the Syndicate, to which your company has conditionally sold the securities, to make an exchange of certain common stock, which the Syndicate

will receive from the United Railways Company by these negotiations for shares of stock held by you in the Transit Company. Your company is advised that the basis of this exchange will be two shares of the common stock of the United Railways Company for five shares of the stock of the Transit Company. The terms and conditions of the exchange are announced by the circular, which is herewith enclosed at the request of the Syndicate Managers.

"ST. LOUIS TRANSIT COMPANY,

"By MURRAY CARLETON,

"President."

On the same day, September 27, 1904, the following letter was addressed by Brown Brothers & Company to the stockholders of the Transit Company, Syndicate Managers.

"New York City, September 27, 1904.

"To the Shareholders of the St. Louis Transit Company:

"Conditioned upon the execution and accomplishment of a tripartite contract between the St. Louis Transit Company, the United Railways Company of St. Louis and a Syndicate, of which the undersigned are Managers, and in accordance with the terms of a covenant therein contained between the United Railways Company of St. Louis and the undersigned, as said Syndicate Managers.

"1.   The undersigned do hereby appoint the National Bank of Commerce in St. Louis as their agent, for and in their behalf, to accept and receive the deposit of the shares of stock of the St. Louis Transit Company, subject to the terms of this proposal, and to issue interim receipts therefor, and to receive applications, as hereinafter stated, for participation in said Syndicate.

"(The Transit Company's stock and applications for participation will be received by Messrs. Brown Brothers & Company, at their offices in New York, Philadelphia and Boston, for transmission, without expense to the depositor, to the National Bank of Commerce in St. Louis.)

"2.   The shares of stock of the St. Louis Transit Company so deposited must be endorsed in blank under a power of attorney authorizing the transfer of same upon the books of the company, and so deposited with said bank on or before the 18th day of October, 1904; and the deposit must also be accompanied with the enclosed proxy, duly executed.

"3.   Upon and subject to the conditions hereinbefore stated, the undersigned, as Syndicate Managers, will exchange with the owner, or his assigns, of the stock so deposited, two shares of the common stock of the United Railways Company of St. Louis for each five shares of the stock of the St. Louis Transit Company, the said United Railways Company's stock, however, to be represented by voting trust

certificates issued under a voting trust agreement to be formed and made by the undersigned, with such terms and conditions as may seem wise to them, as managers, and shall endure for a period of five years from and after November 1st, 1904, unless sooner dissolved pursuant of the terms of such trust agreement.

"4. The Syndicate, of which the undersigned are managers, has been organized to purchase certain bonds and stocks mentioned in said Tripartite Agreement, belonging to the St. Louis Transit Company, and upon a plan and terms heretofore agreed upon between Syndicate and Managers, after the consummation of which there will remain in the possession of Managers, as the property of the underwriters—

| | |
|---|---|
| $2,000,000 5 per cent Improvement Bonds 85 ........ | $1,700,000.00 |
| $2,877,000 First General Mortgage 4 per cent Bonds of the United Railways Company ............. | |
| 12,273 shares of the Preferred Stock of the United Railways Company ........................ | 5,300,000.00 |
| 165, 092.80 shares of the Common Stock of the United Railways Company ........................ | |

"At a total of ............................... $7,000,000.00

"It is the desire of Syndicate Managers to afford such of the shareholders of the St. Louis Transit Company as shall deposit their stock, as hereinbefore provided, an opportunity to participate in such purchase of said bonds and stocks under the said Syndicate plan. This offer is, however, entirely without any consideration, and purely voluntary on the part of Managers and Syndicate.

"The application of all such stockholders of Transit Company as, on or before Friday, October 7th, 1904, shall be made in accordance with the subjoined communication to the National Bank of Commerce in St. Louis, as agent for Syndicate Managers, for participation in said Syndicate purchase, will have the attentive consideration of Managers, and allotment upon such applications will be made as soon thereafter as practicable; but Managers may require any such applicant to give a guarantee of his financial responsibility, or security for the full amount of his application, and reserves the right to allot a lesser amount than that applied for.

"BROWN BROTHERS & COMPANY,
Syndicate Managers."

On the 10th day of October, 1904, the following agreement was entered into between Brown Brothers & Company and a Syndicate:

"Agreement made this 10th day of October, One Thousand, Nine Hundred and Four, by and between Brown Brothers & Company (hereinafter called 'Syndicate Managers'), party of the first part, and the subscribers hereto (hereinafter called severally, the 'Subscribers' and collectively the 'Syndicate'), severally, parties of the second part.

"Whereas, on the 27th day of September, 1904, Syndicate Managers, as such, pursuant to an understanding with Subscribers and in anticipation of this formal contract, did enter into an agreement (hereinafter called 'Tripartite Agreement') with the St. Louis Transit Company, a corporation, and the United Railways Company of St. Louis, also a corporation, pursuant to a plan of readjustment of the capitalization and affairs of the said two corporations, and for certain other purposes specified in said plan; copies of which contract and plan are hereto attached and made part hereof, and are to be read and constituted as a part of this agreement, with the understanding that no estimate, statement, stipulation, explanation or suggestion contained in said plan is intended for or is to be accepted as a representation of warranty upon the part of the Syndicate Managers, or as a condition of subscription hereto.

"And, Whereas. It is estimated under the Tripartite Agreement and plan aforesaid that the Syndicate will receive and retain for their own account the following bonds and stocks, to-wit:

$2,000,000.   St. Louis Transit Company five per cent proposed Improvement Bonds;

·2,877,000.   United Railways Company of St. Louis four per cent First General Mortgage Bonds;

1,227,300.   (par value) United Railways Company of St. Louis five per cent Cumulative Preferred Stock;

18,009,280.   (par value) United Railways Company of St. Louis Common Stock.

"And Whereas, The estimated aggregate amount of money required under the terms of said Tripartite Agreement, on the part of Syndicate, to make payment of the aforesaid bonds and stocks, and to do the things therein required of Syndicate, is seven million dollars.

"Now This Agreement Witnesseth: That in consideration of mutual promises the parties hereto agree, and the Subscribers severally agree with each other and with Syndicate Managers, as follows:

"1.   From time to time on calls made by Syndicate Managers and to such parties as shall be specified in such calls, the subscribers, severally and respectively, will pay to Syndicate Managers such sums in cash or in five per cent notes of the Transit Company due 1st November, 1904, at par, with interest, as shall be called by Syndicate Managers, but in the aggregate not exceeding their respective subscriptions hereunder.

"2.   Subscribers form a Syndicate for the purpose of performing and carrying out said Tripartite Agreement. Each subscriber shall indicate opposite his name the total sum of his subscription on account of the whole Syndicate obligation hereunder, and the several subscribers shall be called upon to make payments in respect to their several subscriptions only ratably, according to the respective amounts thereof, but each subscriber shall be so responsible to the full extent of his undertaking, regardless of performance or non-performance by any other subscriber.

"When, and as requested by Syndicate Managers and without reference to the recsipt or to the possession hereunder by Syndicate Managers or by the subscribers of any bonds or stock, each subscriber will make any and all payments, and will perform all his undertakings of this agreement, and will do all things which by Syndicate Managers shall be deemed desirable to do in the accomplishment of the purposes of this agreement.

"Nothing herein contained or otherwise shall constitute the parties hereto partners, or shall render any one of the subscribers liable to contribute more than his several proportionate amount as herein provided, or shall prevent any of the parties from contracting with each other with reference to any of their respective interests.

"3. In case of any failure of any subscriber to make any payment called for or to perform any of his undertakings hereunder, Syndicate Managers in their sole and exclusive discretion may exclude such subscriber from all interest in the Syndicate; and in their discretion and in such manner as they may deem proper, without any proceeding, either at law or in equity, they may dispose of such subscriber's participation hereunder or of any interest or right of such subscriber hereunder, or under said proposed contracts; but, nevertheless, such subscriber in default shall be responsible to Syndicate Managers for the benefit of the other subscribers hereto for all damages caused by any failure on his part. At any public sale under this article of any interest or right of any subscriber, Syndicate Managers, or any party hereto, may become purchaser for their or for his own benefit, without accountability.

"4. Brown Brothers & Co., as Syndicate Managers, shall have the power and authority, from time to time, in such manner and on such terms as from time to time, either generally or in special cases, they may deem expedient:

"(1) To do and perform any and all acts required to be done by Syndicate under and pursuant to the terms of said Tripartite Agree ment and said plan, and to make and execute any and all contracts in or about the premises which Syndicate or subscribers personally might or could do.

"(2) To receive all the securities which, under said Tripartite Agreement and plan, will be acquired by Syndicate, and to deposit all shares of common stock of the United Railways Company of St. Louis which shall be so received or required, for the term of five years, with voting trustees, to be by them appointed, under such voting trust agreement as they may deem expedient and may direct.

"(3) To hold, manage and sell for Syndicate account any and all bonds, stocks, certificates and securities received or acquired by Syndicate under the terms of said Tripartite Agreement and plan, at such prices and on such terms as to credit, security or otherwise, as they may deem expedient.

Johnson v. United Rys.

"(4)' During the term of this agreement to acquire by purchase, at public or private sale, with funds which they may derive from the sale of any of the original Syndicate assets, bonds, shares of stock, certificates and securities, or bonds, shares of stock, certificates or securities, of like character to those originally belonging to the Syndicate, with power to sell all or any part of such reinvestments and again similarly to reinvest the proceeds of such sales: Provided, however, that at no time shall this power be exercised to such extent as shall entail upon any of the subscribers any personal obligation to pay for such newly acquired assets, it being intended that the power to purchase shall be limited to a use of the assets originally acquired and the proceeds of their conversion and reconversion. In no event shall the Subscribers by reason of such purchases be rendered liable for an amount beyond that of their respective subscriptions.

"(5) All assets of the Syndicate and all net proceeds resulting from sales of any part thereof, or from any other transaction of Syndicate Managers therewith for account of the Syndicate under any of the provisions hereof, shall be applied by Syndicate Managers as follows:

"(1) To the payment of any and all expenses and obligations incurred by Syndicate Managers under any provision of this agreement.

"(2) To Syndicate Managers shall be paid as compensation for their services in securing and underwriting of the plan and Tripartite Agreement aforesaid, and subscription to this agreement and advice in the management of the property of the United Railways Company of St. Louis during the life of this Syndicate, voting trust certificate or certificates representing 15,000 shares of the common stock of the United Railways Company of St. Louis acquired and to be acquired under said agreement and plan.

"(3) In re-payment to the subscribers (so far as the same may be sufficient for that purpose) of all sums by them respectively paid to Syndicate Managers pursuant to Article First; such repayment to be made to the subscribers ratably.

"(4) One-fifth of any residue of such stocks and net proceeds remaining after payment in full of all sums payable under clauses (1), (2) and (3) of this article, shall be retained by and shall belong to Syndicate Managers for their own use as compensation for their services in forming and managing the Syndicate and selling the securities; and the remaining four-fifths of such residue shall be distributed by Syndicate Managers among the subscribers ratably, according to their respective interests. In ascertaining profits, unsold assets distributed to stockholders shall be taken at the price at which they were originally acquired.

"Such twenty per centum of any such residue shall be the only compensation to be received by Syndicate Managers for their services in the matter, saving the compensation specified under Clause (2); and in case there shall be no such residue, Syndicate Managers shall not receive any compensation for their services other than that so

specified in Clause (2). Any stocks or other assets comprised in such residue may be sold by Syndicate Managers within the time fixed in this agreement, or may be distributed by them as they may deem expedient.

"Such application of such net proceeds and such distribution of such residue may be made by Syndicate Managers from time to time when and as they may deem expedient.

"All cash sums received by Syndicate Managers under any provisions of this agreement shall be held by them as bankers.

"6. Syndicate Managers shall issue to the subscribers suitable receipts for the respective payments made hereunder, and shall issue to the respective subscribers certificates of interest substantially in the form following. Such certificates of interest and all rights and obligations hereunder, of the respective subscribers, may be made transferable in the way and manner indicated hereinafter:

"No. ———————

"Participation Certificate of Beneficial Interest in Purchase of Bonds of St. Louis Transit Company and Bonds and Stocks of the United Railways Company of St. Louis.

"Brown Brothers and Company, Managers of a Syndicate formed under an agreement bearing date the 10th day of October, 1904, for the purchase of certain stocks and bonds of the St. Louis Transit Company and the United Railways Company of St. Louis, under a Tripartite Agreement between the St. Louis Transit Company, United Railways Company of St. Louis and Syndicate Managers, dated September 27th, 1904.

"Hereby Certify, that .......................................... has paid the sum of ..........Dollars, ($......), being the first call of..........per cent upon an allotted subscription of...........Dollars, ($.......)', under the terms and provisions of the above mentioned agreement.

"Upon the payment of the amount of such subscription as and when called by Syndicate Managers, and in accordance with the terms of said Syndicate Agreement (to all the provisions of which this certificate and the rights of the holder hereof are subject) the registered holder hereof, upon the surrender of this certificate, properly endorsed, will be entitled to receive his pro rata proportion of cash or securities or both, in accordance with the terms of said Syndicate Agreement.

"This certificate is transferable only on the books kept for that purpose at the office of Brown Brothers & Company, in the City of New York, by the above named beneficiary or his agent duly authorized.

"No assignment of transfer of any interest hereunder, or issuance of new certificate to an assignee, shall release the original subscriber from full liability for his subscription.

"Payments upon calls as made must be endorsed hereon.

"New York City, ......................... ,1904, ..............

Johnson v. United Rys.

"And, upon the back of each such certificate, shall be' a form of assignment substantially as follows:

"For Value Received, .............................. Hereby Sells, Assigns and Transfers unto all right, title and interest in the subscription represented by the within certificate, and subject to all the terms thereof, and does hereby . irrevocably constitute and appoint .............................. attorney, with full power of substitution in the premises, to transfer this certificate on books kept for that purpose by Brown Brothers and Company, 59 Wall Street, New York.

"Witness:                    ..........................

..............................

Dated ........................ day of ...............190.."

"7.   The Syndicate shall continue until the 10th day of October, 1905, but may be extended beyond that date by the Syndicate Managers, provided such extension shall not exceed one year after the said 10th day of October, 1905.  Syndicate Managers may, however, in their discretion, at any time, terminate this agreement upon such notice to the subscribers as they may deem proper.

"8.   Syndicate Managers shall be the sole and final judges as to whether at any time it is to the interest of the Syndicate to proceed further under this agreement, or under said proposed proceedings thereunder. In such event all the stocks and other contracts; and whenever they may deem expedient, they may abandon the objects contemplated in this agreement and said proposed contracts, and all proceedings thereunder.   In such event all the stocks and other assets by them acquired hereunder and then held for account of the Syndicate, and the proceeds of such stocks and other assets, shall remain charged with the payment of all expenses and liabilities by them incurred hereunder, and shall be applied in the way and manner indicated in the Fourth Article in clauses (1), (2), (3) and (4).

"9.   Syndicate Managers shall have authority, from time to time, and at any time, to incur such expenses as they may deem proper in carrying out or in endeavoring to carry out this agreement or said proposed contracts, or in doing any act or thing which they may deem to be in the interest of the Syndicate, and they shall have power and authority in their sole and absolute discretion, finally to fix and to pay all compensation of depositories, brokers, agents, counsel and others; and in the expense account may be included broker commissions as usually paid on all purchases and sales; but Syndicate Managers shall not charge any brokerage for themselves additional to the amount herein provided.

"10.  Syndicate Managers shall have the sole direction and management of the Syndicate during the term hereof.  During said term they shall have the right to the exclusive custody of the assets held hereunder.   The enumeration of specific powers in this agreement shall not be construed as in any way limiting any general power intended to be conferred upon, or to be reserved to, Syndicate Managers; it

being intended to reserve to them, and there are expressly conferred upon them in addition to the general and specific powers recited herein, such other general and specific powers which, from time to time, they may deem necessary in order fully and effectually to carry out what they may deem to be the purposes of this agreement, and of this Syndicate, whether or not said purposes be herein expressed.

"Syndicate Managers, in their discretion, may submit to the subscribers any proposed change or modification of this agreement, and when assented to in writing by a majority in interest of the subscribers, any change or modification so submitted by them shall become a part of this agreement, and shall be binding upon all of the subscribers and those claiming under them, or each of them.

"Syndicate Managers shall not be liable for any error of judgment or for any mistake of law, or of fact, not shall they be liable for any act or omission while endeavoring in good faith to carry out their purposes according to their judgment. No obligation or liability in addition to those herein expressed shall be applied against them. In no event shall they be responsible for the re-payment to the subscribers of the sums by them paid under any article hereof; but said sums shall be repayable only as herein provided out of any stocks or other assets applicable to such payment, under the provisions of this agreement.

"11. Syndicate Managers may become subscribers hereto. As such subscribers they shall be liable for any subscriptions made by them, and shall be entitled in all respects so the same rights and benefits as other subscribers. They may sell any stocks or other assets by them held hereunder to any other subscriber, and any such other subscriber may make any purchase from any Syndicate Manager.

"From time to time Syndicate Managers may offer, on such terms as they may deem expedient, to sell any such assets to subscribers severally and ratably, in sums proportionate to their respective Syndicate subscriptions, and in any such offering they may provide for the disposition of any untaken stocks or other assets in such way as they may deem expedient. In any offering Brown Brothers and Company, as Syndicate Managers, shall be entitled, the same as other subscribers, to the benefits of such offering, and to purchase their ratable amount of the assets so offered, and to hold the same without further accountability.

"12. This agreement shall bind, and shall be for the benefit of, the parties hereto and of their respective executors and administrators.

"All rights and powers of Brown Brothers & Company hereunder shall vest in such firm, as, from time to time, constituted, without further act or assignment.

"13. Each subscriber shall set opposite his subscription herein an address to which notices, calls or other communications may be sent, and any notice, call or other communication addressed to any subscriber at the address so given, and either left at such address or

mailed, shall be deemed actually given to such subscriber, and shall be sufficient for all the purposes hereof: If any subscriber shall fail so to furnish his address to Syndicate Managers, he shall not be entitled to any notice of calls or offers, or another notice hereunder, and he shall be deemed to assent to any action of Syndicate Managers.

"In Witness Whereof the parties of the first part have hereunto affixed their signatures, and the parties of the second part, at various dates, have affixed their subscriptions hereto, it being understood that, for convenience, this agreement may be subscribed in several parts, and copies, with like force and effect as if all the subscriptions were upon one part or copy thereof.

Signed, Brown Brothers & Co.

| Name | Address | Amt. Subscription in Dollars |
|------|---------|------------------------------|

Memorandum.

"Readjustment of the Capital and Finances of St. Louis Transit Company and United Railways Company of St. Louis. In 1899 all the street railway systems of St. Louis, 293.48 miles (now 358.65) were purchased and consolidated by the United Railways Company of St. Louis (save the St. Louis and Suburban System, 28 miles), under a charter of the State of Missouri and a fifty year franchise of the City of St. Louis, which has still over forty-three years to run, or until April 12th, 1948.

"Capitalization—United Railways Company of St. Louis:

| | | |
|---|--:|--:|
| General First Mortgage 4 per cent Gold Bonds: Issued | $28,292,000 | |
| Reserved for underlying liens | 13,708,000 | |
| Reserved for St. Louis & Surburban | 3,000,000 | $45,000,000 |
| | | |
| Preferred Stock: | | |
| In the hands of the public | 11,755,900 | |
| Owned by Transit Company and pledged by it | 8,223,200 | |
| In Treasury of Transit Company | 4,100 | |
| Reserved for Purchase of Underlying Companies | 16,800 | 20,000,000 |
| Common Stock: | | |
| Reserved for Future Requirements, Betterments and Improvements | 7,652,500 | |
| Reserved for Acquisition of Outstanding Stocks and Underlying Companies | 86,200 | |
| In Treasury of Transit Company and pledged by it | 17,261,300 | $25,000,000 |
| | | |
| Total Capitalization of the United Railways Company | | $90,000,000 |
| Capitalization—St. Louis Transit Company: | | |
| Three Year 5 per cent Collateral Trust Notes, due November 1st, 1904 | $5,776,000 | |

| | | |
|---|---:|---:|
| 20 Year 5 per cent Refunding and Gold Bonds: Reserved for Improvements, but only to be issued after 1905, and then only in amounts not to exceed $500,000 per annum | 5,944,000 | |
| Reserve for Above Notes | 6,056,000 | |
| In Hands of the Public | 8,000,000 | $20,000,000 |
| Capital Stock: | | |
| Reserve for Future Requirements | 2,735,700 | |
| Issued and in Treasury of Company | 3,000 | |
| Issued and in the hands of Public | 17,261,300 | 20,000,000 |
| Total Capitalization of St. Louis Transit Company | | $40,000,000 |
| Capitalization of both Companies | | $130,000,000 |

### Lease.

"The United Railways Company of St. Louis (hereinafter called Railways Company), is leased to the St. Louis Transit Company (hereinafter called Transit Company), for a period of nearly forty years, or from October 1st, 1899, to the first day of April, 1939. The Transit Company is a corporation chartered by the State of Missouri. Under an ordinance of the City of St. Louis, approved on the 20th of March, 1899, it has power to acquire, lease and operate until the 18th day of March, 1939, any of the lines acquired by the Railways Company under the plan of consolidation.

"During the continuance of the lease, the Transit Company is obligated to pay a net annual rental of five dollars a share upon all of the preferred stock of the Railways Company now outstanding, or which may hereafter be issued by Railways Company with the consent of Transit Company, and among other things, to maintain, operate and keep the railways, property and premises, and every part of the same, in good repair, working order and condition, and supplied with rolling stock and equipment; to make any and all repairs and replacements, and any and all additions thereon, and reasonable improvements. In payment for such expenditures the Railways Company is obligated to issue to the Transit Company, at par, its first general mortgage bonds and preferred and common stocks.

"Under the lease, the Transit Company, among other securities, has received and would receive:

"$2,877,000 First General Mortgage Four Per Cent Bonds of the Railways Company.

"$8,227,300 Five Per Cent Cumulative Preferred Stock of the Railways Company.

"$24,913,800 Common Stock of the Railways Company.

"Of this latter amount it has for expenditures heretofore made, received about $17,261,300.

"About $17,261,300 Railways Company Common Stock and $3,329,-700 Railways Company Preferred Stock are pledged as collateral for the refunding and improvement mortgage.

"The $2,877,000 four per cent bonds and $4,893,500 of the five per cent Preferred Stock are pledged as collateral for the payment of the $5,776,000 Three Year Collateral Trust Notes of the Transit Company outstanding, and upon payment of these Notes, are to be deposited with the Trustee of the Five Per Cent Refunding and Improvement Gold Bonds, as additional security for the same.

Refunding and Improvement Bonds.

"February last the Transit Company sold to a Syndicate $8,000,-000 of its Five Cent Refunding and Improvement Gold Bonds, for which there appears to be no market. $6,056,000 more of these bonds are reserved for the retirement of the $5,776,000 five per cent notes due November 1st, 1904.

Proposal.

"It is proposed that a syndicate shall be formed to readjust the Capitalization of the two companies and by that means provide the cash necessary for the payment of the Transit Company notes, and its current obligations, and, further, provide working capital. Provision is also to be made for the future needs of the Railways Company by means of securities to be reserved for improvements.

"Briefly, if the Transit Company shall cancel the present issue of $20,000,000 Five Per Cent Refunding and Improvement Bonds and release the collateral under them, and in lieu thereof issue $10,000,-000 Five Per Cent 20 Year Improvement Bonds, guaranteed by the Railways Company, which guarantee shall in turn be secured by a mortgage upon all the property of the United Railways Company, then the Syndicate will endeavor to secure an exchange by which the present holders of $8,000,000 of Refunding and Improvement Bonds will accept in lieu thereof $8,000,000 of new Improvement Bonds and will make a contract with the Transit Company to buy all the securities in its treasury for $7,000,000 in consideration of the Transit Company further agreeing to cancel and release, whenever called upon to do so by the Railways Company, the leasehold conveyed to it by the lease of the Railways Company, bearing date the 30th day of September, 1899.

"Simultaneously the Railways Company is to evacuate an agreement with the Syndicate, by which the former will demand from the Transit Company a release from its lease, bearing date 30th day of September, 1899, and will accept such release and will undertake the operation of all of the railroads so released to it by the Transit Company, and will also guarantee, and as between itself and said Transit Company assume and pay the $10,000,000 Five Per Cent 20 Year Improvement Bonds of the Transit Company, and will convey and issue to Syndicate all of its common stock heretofore unissued by it,

9—281 Mo.

about $7,652.500, in consideration of Syndicate depositing with a Trust Company, for the benefit of Railways Company, upon conditions to be named, 70,000 shares of its Preferred Stock.

### Voting Trust.

"So as to protect and insure the proper management of the Railways Company during the next five years, and protect the value of the securities bought by the Syndicate, it is proposed that all the common stock received by the Syndicate shall be exchanged for Voting Trust Certificates, under an agreement covering a period of five years from the date of purchase, unless, in the discretion of these Trustees, it shall be deemed expedient to sooner dissolve the Voting Trust.

### "Offer to St. Louis Transit Company Stockholders.

"Of the Common Stock of the Railways Company bought by the Syndicate and received from the Railways Company, the Syndicate will offer each individual holder of Transit Company Stock, on deposit of his Stock, within twenty days of the date of the offer, with a Trustee to be named, one Voting Trust Certificate for two shares of United Railways Common Stock for five shares of Transit Company Stock so deposited; it being part of the Syndicate agreement with Railways Company that any St. Louis Transit Company Stock so received in exchange by the Syndicate shall be delivered to the Railways Company. The amount of United Railways Common Stock required for this exchange is $6,904,520 par value. Any stock not taken under the offer is to remain the property of the Syndicate.

### Preferred Stock Agreement.

"Of the $8,227,300 Preferred Stock of the United Railways Company included in the purchase from the Transit Company $7,000,000 is to be deposited with a Trustee for account of the Railways Company, to be held for improvements or betterments, or otherwise, and sold only under instructions from the Board of ·Directors of the Railways Company, as appointed by the Voting Trustees.

### Managers' Compensation.

"Of the Common Stock of the Railways Company acquired by the Syndicate from the Transit Company and the Railways Company, Managers are to retain 15,000 shares as compensation for their services in securing underwriting, carrying out plan of readjustment and managing the property of the Railways Company during the life of the Syndicate. In addition and for selling the securities acquired by the Syndicate they are to receive 20 per cent of profits from sales, after all expenses of management, etc., have been deducted.

### General Mortgage Reduction.

"It is proposed that the $3,000,000 General Mortgage Four Per Cent Bonds reserved in the treasury of the Railways Company for

the purchase of the St. Louis Suburban shall be cancelled, thus reducing the general mortgage to $42,000,000.

### Duration of Syndicate.

"One year, with power in the Managers to extend for a further period of one year.

Result to Syndicate:

| | | |
|---|---|---|
| $2,000,000 Transit Company 5 per cent Improvement Bonds at 85 ........................................$ | | 1,700,000 |
| $2,887,000 Railways Company 4 per cent Mortgage Bonds at 77½ and interest ............................ | | 2,268,035 |
| $1,227,300 Railway Company 5 per cent Preferred Stock at 50 ................................ | | 613,650 |
| Common Stock, Railways Company ...........$24,913,800 | | |
| Less Amount for Transit Stockholders ........ 6,904,520 | | |
| Less Commission Stock ..................... 1,500,000 | | |
| | 8,404,520 | |
| | $16,509,280 | |
| $16,509,280 Common Stock at 17.14 less 2½ per cent | | 2,418,315 |
| | | $ 7,000,000 |

Disposition of Proceeds:

| | | |
|---|---|---|
| For Payment of 5 per cent Notes ............$ | 5,776,000 | |
| To Write Down Assets .................... | 369,000 | |
| For Paving Required by City ............... | 205,000 | |
| For Current Liabilities ..................... | 361,000 | |
| For Working Capital ..................... | 289,000 | $ 7,000,000 |

Ownership of Stock:

| | | |
|---|---|---|
| Preferred Stock in Hand of Public .........$11,755,900 | | |
| Common Stock in Hands of Public .......... 6,904,520 | | $18,660,420 |

Owned by Syndicate, including Commission Stock:

| | | |
|---|---|---|
| Preferred Stock ............................$ | 1,227,300 | |
| Common Stock ............................ | 18,009,280 | $19,236,580 |

### New Capitalization.

| Bonds: | Authorized. | With Trustee and in Treasury. | Outstanding. |
|---|---|---|---|
| Underlying Liens .................. | | | $13,688,000 |
| General Mortgage 4 per cent Bonds of which $12,708,000 are Reserved for Underlying Liens ...........$42,000,000 | | | 28,292,000 |
| Improvement 5s ...................:. 10,000,000 | | | 10,000,000 |
| Preferred Stock .................... 20,000,000 | | 7,016,800 | 12,983,200 |
| Common Stock ..................... 25,000,000 | | 86,200 | 24,913,800 |
| | $97,000,000 | $7,103,000 | $89,877,000 |

Fixed Charges:
    On Underlying Liens ........................$   754,400
    On General Mortgage 4s ....................  1,131,680
    On Improvement 5s ........................    500,000
                                                 ─────────
                                                              $2,386,080

Dividend on $12,983,200 Preferred Stock, Cumula-
    tive, but not a Fixed Charge. ..............              649,160
                                                              ─────────
                                                              $3,035,240

The Tripartite Agreement was submitted to the stockholders of the Transit Company at a special meeting held October 19, 1904, at which the following proceedings were had:

"The secretary then read the call for the meeting as contained in the notice hereinbefore set forth, whereupon Mr. H. S. Priest submitted for the consideration and action of the meeting, the following resolutions, to-wit:

"Whereas, on the 30th day of September, 1899, this company entered into a contract of lease with the United Railways Company of St. Louis, by which it acquired, for a term of thirty years, the right to operate the properties of the lessor, and immediately thereafter entered upon the operation of the properties, pursuant to the terms of said lease; and,

"Whereas, making the improvements, betterments and additions to the demised property as required by the covenants of the lease, the payments of rentals therein provided for, and in the operation of the property, this company has contracted an indebtedness largely in excess of its available resources; and,

"Whereas, in order to pay an indebtedness then due on the first day of November, 1901, this company authorized an issue of $6,000,-000 of three year five per cent collateral trust notes secured by a pledge of the Mercantile Trust Company of St. Louis of $2,877,000 United Railways Company four per cent general mortgage bonds, and 48,935 shares of United Railways Company five per cent preferred stock, which it had acquired for betterments and improvements made upon the property under the terms of the lease aforesaid, of which authorized issue of collateral trust notes $5,776,000 were issued and sold and mature on November 1st, 1904; and,

"Whereas, the indebtedness of this company continued to increase, so that on June 17th, 1903, by authority and direction of a convention of its shareholders, it was determined to issue $20,000,000 five per cent twenty-year refunding and improvements bonds for the purpose of paying the then existing indebtedness, provide for the payment of the above collateral trust notes and create a resource for other improvements and betterments upon the leased property which it had covenanted to make in the aforesaid lease, which bonds

were to be secured by a deposit of the bonds and stock covered by the collateral note pledge and 33,297 shares of the preferred stock of the United Railways Company, and 172,613 shares of United Railways Company common stock, together with a mortgage of its leasehold and the guaranty of the United Railways Company; and,

"Whereas, by the indenture of trust securing the aforesaid issue of bonds, it was provided that $8,000,000 were to be immediately certified and delivered to this company, which bonds were so delivered to this company and sold, but the amount realized therefrom was not sufficient to meet all the financial requirements of this company; and,

"Whereas, this company has been unable to sell the $6,056,000 of bonds reserved by the above indenture of trust, to pay off the collateral notes, for an amount which will enable it to meet the said collateral trust notes at maturity and has been unable to secure an exchange of the said reserved bonds for the collateral trust notes, by reason whereof the reserved bonds are unavailable and valueless to accomplish the purpose for which they were reserved; and,

"Whereas, this company is without financial resources, other than the bonds and stocks pledged as hereinbefore stated, with which to meet its indebtedness, and has no resource wherewith to make improvements, additions and betterments required of it by the above lease; and,

"Whereas, it is proposed to issue $10,000,000 of bonds, to be guaranteed by the United Railways Company, of St. Louis, and its guaranty secured by a mortgage upon all of its property next in rank of lien to that of its general mortgage, for the purpose of exchanging $8,000,000 of the proposed issue at par for the $8,000,000 outstanding of the authorized issue of $20,000,000 refunding and improvement bonds, and to cancel all of the issued and unissued refunding and improvement bonds and release the indenture of trust securing the same, and thereby release the stocks and bonds pledged under the refunding and improvement mortgage; and,

"Whereas, $2,000,000 of the proposed $10,000,000 of bonds, together with the stocks and bonds released from the lien of the refunding and improvement mortgage, and those remaining under the collateral trust note pledge, will enable this company to contract with the United Railways Company for the guaranty of its proposed issue of $10,-000,000 of bonds, and for a mortgage to secure such guaranty as above stated, and for a surrender of the lease, which has become more burdensome than this company can bear; and a sale of these securities to pay off its collateral note indebtedness; and,

"Whereas, on the 27th day of September, 1904, concerning the said premises, this company, the United Railways Company of St. Louis, and Brown Brothers & Company, as Syndicate Managers, entered into the following contract: . . .

"Now, therefore, be it resolved as follows:

"First, that the tripartite contract made and entered into by and between this company, the United Railways Company of St. Louis

and Brown Brothers & Company, as Syndicate Managers, as above set forth, be and the same is hereby approved, ratified and confirmed.

"Second. Resolved, that this company make an issue for the purpose hereinbefore recited, its Improvement Bonds, payable to bearer, or to the registered holder thereof, for the aggregate amount of $10,000,000, which bonds shall bear date October 1, 1904, payable twenty years thereafter, to be of the denomination of $1000 each and to bear interest at the rate of five per cent per annum, and to be substantially in the following form, to-wit: [Here follows the form of the bonds.]

"And be it further resolved that the directors and officers of this company be and they are hereby given full and complete power to do everything in, of and concerning the premises which may appear to them needful or convenient to be done."

One hundred sixty-two thousand one hundred and seventy-five votes were cast, of which Brown Brothers & Company, as proxies, cast 155,127, Murray Carleton, as proxy, 6,749, and 254 by various other parties.

At a meeting of the stockholders of the United Railways Company held on October 20, 1904, the following proceedings were had:

"The secretary then read the call for the meeting as contained in the notice hereinabove set forth, whereupon, Mr. H. S. Priest submitted for the consideration and action of the meeting the following resolutions, to-wit:

"Whereas, this company by the direction and authority of its stockholders and directors has heretofore guaranteed an issue of $20,000,000 of refunding and improvement bonds authorized and agreed by the St. Louis Transit Company; and,

"Whereas, $8,000,000 of said bonds have been sold by St. Louis Transit Company and are now outstanding; and,

"Whereas, said Transit Company has authorized an issue of $10,000,000 of its bonds called 'Improvement Bonds' to be used for the purpose of exchanging $8,000,000 thereof for the said $8,000,000 of outstanding refunding and improvement bonds, the remainder to be used for the purpose of paying in part an issue of collateral trust notes made by said Transit Company, maturing November 1st, 1904, provided this company was guaranteed the said proposed issue of improvement bonds and secured its guaranty thereof by a mortgage upon all of its property next in rank of lien to its general mortgage; and,

"Whereas, the said Transit Company, this Company and Brown Brothers and Company, as Syndicate Managers, entered into the following contract, namely: [Said contract referred to—Tripartite Agreement—is set out above.]

"And whereas, it is to the interest and for the benefit of this company to make the said contract and guarantee the said bonds, and to secure its guaranty by a mortgage or deed of trust as aforesaid;

"Therefore, be it Resolved,

"First. That the said contract made and entered into by and between this company, the St. Louis Transit Company and Brown Brothers and Company, as Syndicate Managers, as set forth, be and the same is hereby approved, ratified and confirmed.

"Second. Resolved, that this company guarantee, for the purpose hereinbefore recited, and under the circumstances hereinbefore recited, the said authorized issue of ten million dollars of improvement bonds of the St. Louis Transit Company, which bonds shall bear date, October 1st, 1904, to be payable 20 years thereafter, and to be of the denomination of $1,000, and to bear interest at the rate of 5 per cent per annum, and to be substantially in the following form: . . . .

"And be it further resolved that this company make its mortgage in substantially the following form to secure its guaranty endorsed upon said bonds, viz: . . .

"Third. And be it further resolved that the directors and officers of this company be and they are hereby given full and complete power, authority and direction to do everything in or concerning the premises which may appear to them needful or convenient to be done."

One hundred sixty-three thousand three hundred and fifty-two shares of preferred stock and 172,613 of the common stock, a total of 335,965 shares, were voted in favor of these resolutions and none against, and they were declared adopted.

No other or further action was taken by the stockholders of either company than as above set out.

At a meeting of the board of directors of the Transit Company held October 20, 1904, the following proceedings were had:

"St. Louis Transit Company.
"Office of the St. Louis Transit Co.
"St. Louis, Mo., Oct. 20, 1904.

"A special meeting of the Board of Directors of the St. Louis Transit Company was held this day at the hour of 2:15 o'clock at the office of the company, Room 618 Security Building, St. Louis, Mo., pursuant to notice duly given, at which were present Mr. Murray Carleton, president, and the following named directors:

"A. D. Brown, James Campbell, Louis A. Cella, F. E. Marshall, H. S. Priest, Robert McCulloch, Geo. L. Edwards. Absent: C. H. Spencer and Eugene Delano. Mr. E. H. Conrades was also present.

"The president stated to the board that at the meeting of the stockholders held on October 19, 1904, the resolutions presented at said meeting (a copy of which are embraced in the minutes of said meeting) were carried in the affirmative by the following vote: 162,175 shares voted in favor thereof and none against.

"On motion of Mr. A. D. Brown; duly seconded by· Mr. James Campbell, the following resolution was unanimously adopted:

"Resolved, That in pursuance of the consent and direction given to the stockholders of this company at their meeting duly called and held on the 19th day of October, 1904, the board of directors hereby authorizes and directs the issue of Improvement Bonds of this company to the amount of $10,000,000 par value, in the form this day authorized by the stockholders of the company, and further authorizes, empowers and directs the president or vice-president and secretary to duly sign and execute the said bonds, and to do any and every other thing requisite or necessary to be done in order to make said bonds effective, and further, to carry into force an agreement made and entered into by and between this company, the United Railways Company of St. Louis, and Brown Bros. & Company as Syndicate Managers, ratified and approved at the said meeting of the shareholders as aforesaid.

"There being no further business before the meeting, the same was, on motion duly seconded, adjourned.

"MURRAY CARLETON, President.

"JAMES ADKINS, Secretary."

On October 26, 1904, Murray Carleton, as president of the United Railways Company, made a formal demand in writing on the St. Louis Transit Company under Article I of the Tripartite Agreement for the surrender of the lease, and on the same day the release was ordered by the board of directors and subsequently a deed of release was duly executed.

The preliminaries being now arranged and the lease surrendered, the Transit Company at midnight of October 31, 1904, delivered possession of the leased property to the United Railways Company and from that hour the United Railways Company undertook the operation of the street car lines. The Transit Company did no further business. In the execution of the Tripartite Agreement all of its property of every kind and character was turned over to the United Railways Company and the Syndicate. Many suits for personal injuries were then pending, but no provision was made for claims

of this character. There was no breach of the lease and the satisfactory condition of the leased property is shown by the following letter of Murray Carleton, the president:

"The United Railways Company of St. Louis, Mo.
Office of President.
"St. Louis, Mo., November 14, 1904.
"Messrs. F. S. Smithers & Co.,
"Messrs. Spencer, Trask & Co.,
    New York City, N. Y.
"Gentlemen:
    "In reply to your inquiry touching the physical condition of the property of the United Railways Company of St. Louis, and its financial condition under the readjustment of the capitalization of the St. Louis Transit Company and the United Railways Company, I submit the following:

"Physical Condition.

"'The St. Louis Transit Company, during 1902 and 1903, and the early part of 1904, expended large sums of money for betterments, construction and equipment, to prepare itself to carry effectively and economically the largely increased traffic incident to the Louisiana Purchase Exposition.

"The above important expenditures inure entirely to the benefit of the United Railways Company. I am, therefore, of the opinion, notwithstanding the increased service required of it, that the condition of the track and equipment is good. The company's power plants have been fully maintained, and a detailed report, now being prepared, will, I think, show that no important additions need to be made to these plants for several years to come. I believe, also, that the company can maintain its track and equipment out of earnings for several years to come with little, if any, recourse to capital expenditure.

"Financial Condition.

"The balance sheet of November 1st, 1904, shows a surplus over all current and accrued liabilities of $633,259.66—$288,714.47 of which is represented by material and supplies on hand, leaving an actual cash surplus of $344,545.19; in addition to which the company has $7,000,000 of its preferred stock in the hands of trustees for future betterments and improvements.

"For your further guidance, I submit a statement of the actual gross and net earnings of the St. Louis Transit Company, and of the United Railways Company for 1902, 1903 and 1904 (two months of the last year being estimated); also an estimate of the gross and net earnings for 1905, which I feel is a conservative one, and within the power of the Company to realize.

Respectfully yours,

(Signed)  Murray  Carleton,

President.

Official Returns and Estimates.

"The following figures represent actual earnings reported by the company for the respective years, with fixed charges based upon the readjustment of the capitalization of the company:

|                                        | 1902           | 1903           |
|----------------------------------------|----------------|----------------|
| Gross Earnings and other income        | $6,452,218.90  | $7,295,847.38  |
| Operating Expenses and Taxes           | 3,967,721.32   | 4,513,514.57   |
|                                        | $2,484,497.58  | $2,782,332.81  |

Interest on Underlying Liens ........... $ 754,400.00    $ 754,400.00

Interest on $28,292,000 First General Mortgage 4s: $1,131,680.00, $1,886,-080.00, $1,131,680.00, $1,886,080.00

Surplus after Charges as above ........ $ 598,417.58    $ 896,252.81

"The following figures are based upon careful and conservative estimates, the earnings for 1904 being estimated for the last two months of the year.  The estimates for 1905 are based upon earnings prior to 1904, as during the present year the St. Louis Exposition traffic has increased the earnings considerably beyond normal proportions:

|                                        | 1904           | 1905           |
|----------------------------------------|----------------|----------------|
| Gross Earnings and other income        | $9,810,150.00  | $8,334,872.00  |
| Operating Expenses and taxes           | 5,591,785.00   | 4,750,877.00   |
|                                        | $4,218,365.00  | $3,583,995.00  |

Interest on Underlying Liens .......... $ 754,400.00    $ 754,400.00

Interest on $28,292,000 First General Mortgage 4s: $1,131,680.00, $1,-886,080.00, $1 131,680.00, $1,886,080.00.

|                                        | 1904           | 1905           |
|----------------------------------------|----------------|----------------|
| Surplus after Charges as above         | $2,332,285.00  | $1,697,915.00  |

"The City of St. Louis is the fourth-largest city in the United States, and has always been prominent for its conservatism.  It is the largest railroad center, and the third-largest commercial and jobbing center, in the United States.  During the eight years from 1896 to 1903, inclusive, the assessed valuation of real estate has increased over 21 per cent.

"The Southwestern country, which is immediately tributary to St. Louis, has in recent years shown very remarkable and substantial growth.  It has been the field of over one-half the railroad construction of the past three years, and the continued increase of population and wealth will contribute to the prosperity of St. Louis and its interests."

The contention of the United Railways Company is that it assumed and paid obligations of the Transit Company in excess of the property received, and two statements were offered in evidence, for the purpose

of showing the assets taken and liabilities claimed to have been assumed, as follows:

"Liabilities Assumed and Assets Required from St. Louis Transit Company upon the Surrender of its Lease to the United Railways Company of St. Louis, October 31, 1904.

### LIABILITIES.

| | |
|---|---:|
| St. Louis Transit Company Improvement, 20-year 5 per cent Gold Bonds guaranteed by United Railways Co. | 10,000,000.00 |
| Bills payable | 735,221.00 |
| Accounts payable—audited vouchers | 324,858.11 |
| Unclaimed wages | 4,210.40 |
| Trust fund certificates — employes' savings deposit | 6,445.00 |
| Employes' badge deposit | 288.65 |
| Outstanding bank checks | 402.55 |
| Matured bonds and coupons | 105,380.00 |
| Dividends accrued on United Railways Company preferred stock | 54,096.66 |
| Interest accrued on funded debt | 627,860.00 |
| Outstanding tickets | 14,987.50 |
| Sundry creditors | 14,309.73 |
| Sundry accrued and reserve accounts | 33,422.94 |
| Total liabilities assumed | $11,921,482.54 |

### ASSETS.

| | |
|---|---:|
| Preferred capital stock of United Railways Company of St. Louis (70,000 shares) held by The National Bank of Commerce in St. Louis, Trustee | $7,000,000.00 |
| Capital stock of the Louisiana Purchase Exposition Company, par-value $210,000.00 | 2,100.00 |
| Securities due from the United Railways Company of St. Louis for construction and equipment: | |
| Expenditures | 1,118,876.57 |
| Material and supplies on hand | 286,614.47 |
| Cash | 614,015.25 |
| Brown Brothers & Co., Syndicate Managers | 1,224,000.00 |
| Bills receivable | 86,556.73 |
| Accounts receivable | 48,247.07 |
| Conductors' collections | 559.50 |
| City of St. Louis | 2,007.33 |
| United States Government—P. O. Dept. | 11,044.40 |
| The Fidelity & Casualty Co., of N. Y. | 75,000.00 |

Cash on Deposit for Payment of Matured
Bonds and Coupons .................... 105,380.00
Sundry debtors ......................... 17,206.92
Sundry accounts paid in advance ......... 82,010.53

                                             $10,673,618.77

Excess of liabilities over assets acquired by the
United Railways Company of St. Louis,
October 31, 1904, upon surrender of Transit
Company's lease ........................ $ 1,247,863.77

## The second is as follows:

"Liabilities of the St. Louis Transit Company Paid and Assumed and Assets Acquired From Said Company by United Railways Company of St. Louis.

Exhibit.                    Liabilities.

A   St. Louis Transit Company Improvement 20-year 5
percent Gold Bonds guaranteed by United Railways
Co. ........................:.......................$10,000,000.00
B   Bills Payable and Accrued Interest .............. . 743,909.00
C   Accounts Payable — Audited Vouchers .......... 324,858.11
D   Employes' Trust Fund Certificates ............... 6,445.00
E   Outstanding Checks of St. Louis Transit Company .. 402.55
F   Matured Bonds and Coupons ................... 105,380.00
G   Interest Accrued on Funded Debt .............. 627,860.00
H   Injuries and Damages Claims Paid by United Rail-
ways Co. of St. Louis on which Appeal Bonds had
been Given .................................. 273,058.03
      (Amount of said Appeal Bonds $583,626.84.)
I   Unclaimed Wages ..........,................... 4210.40
"   Employe's Badge Deposits .................... 288.65
"   Dividend Accrued on 129,832 shares Preferred Stock
of United Railways Company of St. Louis ........ 54,096.66
"   Outstanding Tickets of St. Louis Transit Company 14,987.50
"   Sundry Accrued and Reserved Accounts .......... 1,804.20
J   Sundry Creditors .............................. 14,249.73

             Total Liabilities Assumed $12,171,549.92

Exhibit                    Assets.

K   Capital Stock of the Louisiana Purchase Exposition
Co. Par Value $210,000.00 .....................................
"   Expenditures Made on Property of United Railways
Co. of St. Louis by St. Louis Transit Co. not paid by
United Railways Co. October 31, 1904 .......... 1,118,876.57
"   Material and Supplies on hand ................. 286,614.47
"   Cash ......................................... 614,015.25
"   Brown Bros. & Co. Syndicate Managers .......... 1,224,000.00

Johnson v. United Rys.

| | | |
|---|---|---:|
| " | Conductors' Collections | 559.50 |
| " | City of St. Louis | 2,007.33 |
| " | United States Government—P. O. Dept. | 11,044.00 |
| " | The Fidelity & Casualty Co. of N. Y. | 49,500.00 |
| L | Cash on Deposit for payment of Matured Bonds and Coupons | 105,380.00 |
| M | Notes Receivable and Interest Accrued to Oct. 31, 1904 | 88,479.97 |
| N | Sundry Debtors | 17,206.92 |
| O | Sundry Accounts Paid in Advance | 82,010.53 |
| P | Accounts Receivable | 44,251.91 |
| | | $ 3,643,946.85 |

"September 30th, 1909."

Exhibit "H" referred to in this statement, covering $273,058.03, is entitled as follows:

"Statement of St. Louis Transit Company damage claims paid by United Railways Company of St. Louis from November 1st, 1904, to September 30th, 1909, for which bonds were given."

In the itemized statement of Exhibit "G" entitled, "Interest accrued on funded debt $627,860," appears this item: "St. Louis Transit Company Improvements Bonds, $10,000,000. 5 per cent $41,666.66."

These bonds were not authorized to be issued until October 20, 1904, and were to be assumed under the terms of the Tripartite Agreement by the United Railways Company.

The answer of defendant Transit Company is a general denial and a plea of champerty. The United Railways Company sets up the lease, the Tripartite Agreement and proceeds:

"And defendant, further answering, says that on the ————— day of October, 1904, it requested the Transit Company to surrender to it, by proper instruments or conveyance of release, all and singular the property demised by the lease of September 30th, 1899, and the delivery, assignment and transfer to it of the possession of all said demised property, and all cash, bills receivable and other credits then owned or held by it as provided in the first paragraph of Article I of the agreement last mentioned, this defendant being thereto requested by Brown Brothers & Company, Syndicate Managers, as is provided by paragraph b of Article III., of said agreement last mentioned; and this defendant says that the said St. Louis Transit Company did thereupon, and pursuant to said agreement and said request make a con-

veyance of release to all the property demised of the said lease of September 30th, 1899, and did, on the 31st day of October, 1904, deliver, assign and transfer to this defendant immediately possession of all said demised property, and all cash, bills receivable, and other credits then owned or held by it; and that thereupon this defendant did release and fully acquit said Transit Company from all liability which had then accrued, or might thereafter accrue to it under and by virtue of the terms of the said lease; and this defendant did assume and undertake to pay all debts then contracted by said St. Louis Transit Company, for labor, materials and supplies rendered or furnished to said St. Louis Transit Company, as is provided by the said agreement of September 27th, 1904.

"This defendant, further answering, admits that, pursuant to the terms of said agreement, and for the consideration therein mentioned, the said St. Louis Transit Company did turn over to it, among other assets, the cash sum of $614,015.25.

"But this defendant further avers that the amounts assumed and paid by it under the said agreement of September 27th, 1904, exceeded in value the assets acquired by it under said agreement from the said St. Louis Transit Company, including the said sum of $614,015.25, by an amount approximating $500,000."

The court below gave judgment in favor of the plaintiff for the sum of $38,373.78, and defendants appealed.

The evidence in this cause has taken such a wide range and the record is so voluminous and confused that the sifting out of that which is material has imposed a great labor, aside from the examination of the vast array of authorities presented.

By stipulation the case was submitted in the court below on the record in the case of Barrie v. United Railways Company, the judgment here in suit being substituted for those in that case.

In the Barrie case, determined by the St. Louis Court of Appeals, 138 Mo. App. 557, the various legal propositions, now again advanced, were exhaustively discussed and the rulings of that court were approved by this court in the case of Johnson v. United Railways Company et al., 247 Mo. 326.

From the view now taken of the case there can be no occasion to go over the ground again.

At the time of the execution of the lease between the United Railways Company and the Transit Company

on September 30, 1899, and up to October 31, 1904, the board of directors of both companies, consisting of eleven members, was composed, with one or two exceptions, of the same persons and Murray Carleton was president of both companies.

The Transit Company had no property, but was authorized to issue stock to the amount of $20,000,000. It issued and exchanged 172,613 shares of its stock for a like number of shares of the common stock of the United Railways Company plus $10 per share, thus obtaining a working capital of about $1,900,000 and becoming the owner of a majority of the $25,000,000 of the common stock of the United Railways Company.

After taking charge under the lease the Transit Company operated the street car lines of the City of St. Louis until midnight of the 31st day of October, 1904, when the United Railways Company again took possession and began their operation.

During the five years of its management the Transit Company became largely indebted and had outstanding in September, 1904, $5,776,000 par value 5 per cent collateral trust notes, maturing November 1, 1904, and $8,000,000 five per cent twenty-year gold bonds, called Refunding and Improvement Bonds. It had received from the United Railways Company under Clause One of the lease for betterments and improvements the following securities: $2,877,000 par value United Railways 4 per cent general bonds and $8,227,300 par value United Railways 5 per cent preferred stock.

All of these securities, as well as the 172,613 shares of United Railways Common stock and the leasehold, were pledged to secure the Collateral Trust Notes and the $8,000,00 of Refunding and Improvement Bonds which were also guaranteed by the United Railways Company.

The Transit Company being without means to meet the payment of the Collateral Trust Notes maturing November 1, 1904, its president, Murray Carleton, on the 9th day of September, 1904, submitted a proposition in

writing to the mercantile Trust Company, which held the securities pledged as collateral, suggesting the issue by the Transit Company of $10,000,000 of a new series of twenty-year bonds to be known as Improvement Bonds, $8,000,000 of which should be exchanged for a like sum of the outstanding Refunding and Improvement Bonds and $2,000,000 should be sold at not less than 85 cents on the dollar, together with so many of the securities of the Transit Company held by the Trust Company as collateral as will be necessary to provide for the principal of the notes due November 1, 1904, and certain requirements aggregating $935,000, said requirements being for paving $205,000, for writing down certain assets $379,000, and for $361,000 current liabilities unprovided for in the sale of the $8,000,000 Refunding and improvement Bonds.

In addition to the "requirements" here mentioned the ransit Company had other large liabilities, and many suits for personal injuries were pending, among them those in which the judgments here in suit were rendered. Claims of this character were so large an item of expense that it required 4½ to 5 per cent of the gross earnings to meet them and a special fund was set apart annually for that purpose.

The proposition submitted by the president of the Transit Company to the Mercantile Trust Company was approved by the board of directors of the Transit Company and formed the basis of the tripartite agreement entered into on September 27, 1904, by the Transit Company, the United Railways Company and Brown Bros. & Company, as Syndicate Managers.

There seems to have been some dissatisfaction with the scheme on the part of the stockholders of the Transit Company, and, to appease them, Brown Brothers & Company addressed to them the following letter:

"New York City, September 27, 1904.

"To the Shareholders of the St. Louis Transit Company:

"Conditioned upon the execution and accomplishment of a tripartite contract between the St. Louis Transit Company, The United Railways Company of St. Louis and a Syndicate, of which the undersigned are

managers, and in accordance with the terms of a covenant therein contained between the United Railways Company of St. Louis and the undersigned, as said Syndicate Managers.

"First. The undersigned do hereby appoint the National Bank of Commerce in St. Louis as their agent, for and in their behalf, to accept and receive the deposit of the shares of stock of the St. Louis Transit Company, subject to the terms of this proposal, and to issue interim receipts therefor, and to receive applications, as hereinafter stated, for participation in said Syndicate.

"(The Transit Company's stock and applications for participation will be received by Messrs. Brown Brothers & Company, at their offices in New York, Philadelphia and Boston, for transmission, without expense to the depositor, to the National Bank of Commerce in St. Louis.

"Second. The shares of stock of the St. Louis Transit Company so deposited must be endorsed in blank under a power of attorney authorizing the transfer of same upon the books of the company, and so deposited with said bank on or before the 18th day of October, 1904; and the deposit must also be accompanied with the enclosed proxy, duly executed.

"Third. Upon and subject to the conditions herein before stated, the undersigned, as Syndicate Managers, will exchange with the owner, or his assigns, of the stock so deposited, two shares for the common stock of the United Railways Company of St. Louis for each five shares of the stock of the St. Louis Transit Company, the said United Railways Company's stock, however, to be represented by voting trust certificates issued under a voting trust agreement to be formed and made by the undersigned, with such terms and conditions as may seem wise to them, as managers, and shall endure for a period of five years from and after November 1st, 1904, unless sooner dissolved pursuant of the terms of such trust agreement.

"Fourth. The Syndicate, of which the undersigned are managers, has been organized to purchase certain bonds and stocks mentioned in said tripartite agreement, belonging to the St. Louis Transit Company, and upon a plan and terms heretofore agreed upon between Syndicate and Managers, after the consummation of which there will remain in the possession of the managers, as the property of the underwriters—

$2,000,000.00 5 per cent Improvement Bonds 85 ........ $1,700,000.00

$2,877,000.00 First General Mortgage 4 per cent Bonds of the .

United Railways Company .......................... 5,300,000.00

12,273 shares of the Preferred Stock of the United Railways

Company ...........................................

165,092.80 shares of the Common Stock of the United Railways Company .......................................

At a total of ..................................... $7,000,000.00

10—281 Mo.

"It is the desire of Syndicate Managers to afford such of the share-holders of the St. Louis Transit Company as shall deposit their stock, as hereinbefore provided, an opportunity to participate in such pur-chase of said bonds and stocks under the said Syndicate plan. This offer, is, however, entirely without any consideration, and purely voluntary on the part of Managers and Syndicate.

"The application of all such stockholders of Transit Company as, on or before Friday, October 7th, 1904, shall be made in accordance with the subjoined communication to the National Bank of Commerce in St. Louis, as agent for Syndicate Managers, for participation in said Syndicate purchase, will have the attentive consideration of Managers, and allotment upon such applications will be made as soon thereafter as practicable; but Managers may require any such appli-cant to give a guarantee of his financial responsibility, or security for the full amount of his application, and reserves the right to allot a lesser amount than that applied for.

"BROWN BROTHERS & COMPANY,
"Syndicate Managers."

Participation certificates were subsequently issued to the stockholders of the Transit Company and they sub-scribed $4,070,681.68 of the $7,000,000 required to pay for the securities.

The tripartite agreement was approved by the board of directors of both companies and was submitted to the stockholders of the Transit Company at a meeting held on October 19, 1904, at which it was unanimously ratified by a vote of 162,175 shares of stock, of which Brown Brothers & Company, as proxies, cast 155,127, Murray Carleton, president of both companies, as proxy, 6794, and 254 were cast by various individuals.

On the following day the agreement was submitted to the stockholders of the United Railways Company and approved by a vote of 163,352 preferred shares and 172,613 shares of common stock.

On the 26th day of October, 1904, Murray Carleton, as president of the United Railways Company, made a formal demand on the Transit Company for a surrender of the lease and the delivery of all cash, bills receivable and other credits, as specified in the tripartite agree-ment. Compliance with the demand was ordered by the board of directors and a deed of release was executed on the 29th day of October, 1904. The United Railways

Company thereupon took possession of all of the property of the Transit Company of every kind and character, excepting the securities sold to the Syndicate, including, among other things, material and supplies valued at $286,614.47. By virtue of what right or authority this was done is not made to appear. There was no official action taken by the board of directors of the Transit Company in regard to the matter, and the stockholders, in ratifying the tripartite agreement, had agreed only to cancel the lease, surrender possession of the premises and to deliver up to the United Railways Company all cash, bills receivable and other credits then owned or held by it.

No breach of the lease had occurred and the leased property was in excellent condition. The United Railways Company then owed the Transit Company, $1,118,876.57 for betterments and improvements.

Mr. Adkins, the treasurer of the Transit Company, testified that all of the assets of the Transit Company were disposed of in carrying out the tripartite agreement.

At midnight of October 31, 1904, the Transit Company delivered up the leased property and the United Railways Company took charge of the operation of the street car lines. The Transit Company had no property left and did no further business.

How completely the Transit Company had been divested of its property is shown by the evidence of Murray Carleton, its president, who was asked:

"Q. And it also turned it back with all these additions and improvements? A. Yes, as far as they existed.

"Q. Turned over everything, didn't it, that it had? A. Yes.

"Q. And after October 31, 1904, Transit Company had no property whatever, did it, and has had no property since that date subject to a levy? A. I don't think it has any tangible property. Somebody has been looking for it, but has been unable to find it.

"Q. At least, the sheriff had not been able to locate anything? A. No, sir.

"Q. The United Railways Company took charge of all that property, and beginning with twelve o'clock October 31, 1904, it became a going concern, or an operating company, did it not? A. Yes, sir."

It is plain from the face of the instrument that the purpose of the tripartite agreement, suggested by Murray Carleton, as he states, was to eliminate the Transit Company and put all of its property into the hands of the United Railways Company. Brown Brothers & Company were simply the manipulators. The agreement was predicated on their ability to organize a Syndicate to purchase the securities of the Transit Company. If they had not succeeded, the tripartite agreement would have failed. Nothing was sold to them by the Transit Company.

To carry out the provisions of Article II of the tripartite agreement a contract was entered into on the 10th day of October, 1904, between Brown Brothers & Company and the subscribers to a fund to purchase the securities of the Transit Company, "collectively called the Syndicate," which recites among other things:

"And, whereas it is estimated under the tripartite agreement and plan aforesaid that the Syndicate will receive and retain for its own account the following bonds and stocks, to-wit:

"$2,000,000 St. Louis Transit Company five per cent proposed Improvement Bonds.

"$2,877,000 United Railways Company of St. Louis four per cent General Mortgage Bonds.

"$1,227,300 (par value) United Railways Company five per cent cumulative Preferred Stock.

"$18,009,280 (par value) United Railways Company of St. Louis Common Stock.

"And, whereas, the estimated aggregate amount of money required under the terms of the tripartite agreement on the part of the Syndicate to make payment of

the aforesaid bonds and stocks, and to do the things therein required is seven million dollars.''

The enumeration here given of the stocks and bonds to be acquired by the Syndicate does not embrace the whole amount of the $8,227,300 of preferred stock agreed in the tripartite agreement to be sold by the Transit Company, with other secureties, to Brown Brothers & Company for the sum of $7,000,000. The Syndicate received $1,227,500,00. and the remaining $7,000,000, passed into the treasury of the United Railways Company. How and upon what consideration does not clearly appear.

This $7,000,000 of preferred stock is listed among the assets received from the Transit Company in one of the statements introduced by defendants, but omitted from the other for some reason.

Under the terms of the tripartite agreement the $289,-000 remaining after satisfying the Collateral Trust Notes and the $935,000 of ''specific requirements'' was to be paid to the Transit Company, or its president. What became of this sum is not shown.

It is called ''working capital'' in the agreement of October 10, 1904, just referred to, where the application of the $7,000,000 to be paid for the securities is stated thus:

''Disposition of Proceeds:

''For payment of 5 per cent notes.....$5,776,000.00
 To write down assets .............. 369,000.00
 For paving required by city........ 205,000.00
 For current liabilities.............. 361,000.00
 For working capital................ 289,000.00

''$7,000,000.00.''

Since, under the plans that were being perfected, the United Railways Company was to supersede the Transit Company as the operating Company and the Transit Company was to be retired altogether, it is reasonable to assume that this $289,000 found its way into the treasury of the United Railways Company, although it is not listed

among the assets received in the statement presented by the defendants.

To show what the United Railways Company had received from the Transit Company and what it assumed and paid the following was offered in evidence:

"Liabilities Assumed and Assets Required from St. Louis Transit Company upon the Surrender of its Lease to the United Railways Company of St. Louis, October 31, 1904.

### LIABILITIES.

| | |
|---|---|
| St. Louis Transit Company Improvement, 20-year 5 per cent Gold Bonds guaranteed by United Railways Co. | 10,000,000.00 |
| Bills payable | 735,221.00 |
| Accounts payable—audited vouchers | 324,858.11 |
| Unclaimed wages | 4,210.40 |
| Trust fund certificates — employes' savings deposit | 6,445.00 |
| Employes' badge deposit | 288.65 |
| Outstanding bank checks | 402.55 |
| Matured bonds and coupons | 105,380.00 |
| Dividends accrued on United Railways Company preferred stock | 54,096.66 |
| Interest accrued on funded debt | 627,860.00 |
| Outstanding tickets | 14,987.50 |
| Sundry creditors | 14,309.73 |
| Sundry accrued and reserve accounts | 33,422.94 |
| Total liabilities assumed .... | $11,921,482.54 |

### ASSETS.

| | |
|---|---|
| Preferred capital stock of United Railways Company of St. Louis (70,000 shares) held by The National Bank of Commerce in St. Louis, Trustee | $7,000,000.00 |
| Capital stock of the Louisiana Purchase Exposition Company, par value $210,000.00 | 2,100.00 |
| Securities due from the United Railways Company of St. Louis for construction and equipment: | |
| Expenditures | 1,118,876.57 |
| Material and supplies on hand | 286,614.47 |
| Cash | 614,015.25 |
| Brown Brothers & Co., Syndicate Managers | 1,224,000.00 |
| Bills receivable | 86,556.73 |
| Accounts receivable | 48,247.07 |
| Conductors' collections | 559.50 |

Johnson v. United Rys.

| | |
|---|---:|
| City of St. Louis ......................... | 2,007.33 |
| United States Government—P. O. Dept. . . ... | 11,044.40 |
| The Fidelity & Casualty Co., of N. Y. ..... | 75,000.00 |
| Cash on deposit for payment of matured bonds and coupons ................. : ........... | 105,380.00 |
| Sundry debtors ....................... ........... | 17,206.92 |
| Sundry accounts paid in advance ............ | 82,010.53 |

$10,673,618.77

| | |
|---|---:|
| Excess of liabilities over assets acquired by the United Railways Company of St. Louis, October 31, 1904, upon surrender of Transit Company's lease ...... ................... | $ 1,247,863.77 |

In this statement appears the item "Brown Brothers & Company, Syndicate Managers, $1,224,000."

To what this relates is left to conjecture, but the inference must be that it was on account of the purchase price of the $2,000,000 of Improvement Bonds specified in the tripartite agreement to be sold to Brown Brothers & Company. These bonds were the only items among the securities for which a definite price was fixed, and this was $1,700,000. So far as shown, there was to be no other pecuniary transaction between the Transit Company and Brown Brothers & Company and the item above mentioned should be $1,700,000 instead of $1,224,000 or $476,000 more than given.

These two amounts, $289,000.00 and $476,000.00, added to the total of assets received, increase the amount to $11,438,618.77.

The United Railways Company pleads that the debts of the Transit Company assumed and paid by it exceeded the assets received. However, it made no agreement with the Transit Company to assume or pay anything. It agreed with Brown Brothers & Company to demand of Transit Company the surrender of the leasehold and the leased property and "immediately upon such surrende to enter into and upon the premises and the operation of said property and coincident therewith, as between itself and Transit Company, to assume the payment of the ten million dollars of the proposed Improvement Bonds guaranteed as herein provided, by Railways Company, and

all debts contracted for labor, material and supplies rendered or furnished to Transit Company." Whatever the legal effect of this stipulation may be under the Statute of Frauds, it must be limited to the debts mentioned. There was no official action of the board of directors or the stockholders of the United Railways Company extending the undertaking.

The consideration for the agreement to assume the payment of the Improvement Bonds and the debts for material, labor and supplies must be found within the terms of the tripartite agreement.

Only two of the items mentioned in the statement can be held to relate to claims for labor, material or supplies; the others must be those which the United Railways Company claims to have paid without regard to the tripartite agreement, and these, if paid, were paid with assets taken from the Transit Company.

In the execution of the tripartite agreement every vestige of property belonging to the Transit Company, excepting the securities sold, went into the hands of the United Railways Company. No inventory was taken, no price fixed or agreed upon and no sale made or contemplated. As expressed by Murray Carleton, the president of the United Railways Company, "the tenant moved out and the landlord moved in," and took possession of everything, including material and supplies estimated at $286,614.47.

According to Murray Carleton the Transit Company had no "tangible" property left after October 31, 1904.

Many damages suits for personal injuries were pending, and with reference to claims of this character Murray Carleton testified:

"Q. Well, you voted for and assisted in the distribution of these assets, didn't you? A. Why of course. I was very glad to vote for something that would release me from those obligations and pay the debts of the Transit Company.

"Q. Well I am talking now about the matter of distributing this stock among the shareholders of the

United Railways Company. You knew as president of the United Railways Company when you participated in that deal that you were aiding the Transit Company, that is to say, that the United Railways Company was aiding the Transit Company, in placing itself beyond the reach of its creditors, isn't that true? A. Never had any such motive in mind.

"Q. Well, isn't that a fact that that was the result? A. Well, I don't see it that way.

"Q. You knew by that action, however, that that would be the result, didn't you? A. As I have stated repeatedly, I had no concern whatever except as to the notes and fixed liabilities of the Transit Company. With these I was concerned, and with these used my best efforts and endeavor to see that they were discharged, and they were discharged and paid in full.

"Q. And you had no concern about people who had claims against the Transit Company, as to whether they were paid or not paid? A. None whatever.

"Q. And you didn't care anything about it? A. Not a particle."

This indifference of Mr. Carleton, who was president of both companies and the moving master spirit in the whole transaction, was shared by the members of the board of directors, since it appears that the general indebtedness of the Transit Company was not discussed in the meetings while these proceedings were pending.

That it was large is apparent from the answer of Mr. Carleton when asked to explain why it was that the securities of the Transit Company sold to the Syndicate had advanced in price so rapidly after the tripartite agreement had been carried out. He said it was because the property had gone into "strong hands," that the United Railways Company had property and no debts, while the Transit Company had debts and no property.

Notwithstanding the complete undoing of the Transit Company the United Railways Company, after October 31, 1904, continued to defend suits brought against the Transit Company.

As to this Murray Carleton testified:

"Q. Well, after October 31, 1904, and after the Transit Company had ceased to be a going concern and the United Railways Company continued the business, the United Railways Company through its officers and attorneys continued, did it not, to defend cases brought against the Transit Company, settle suits and claims, pay attorneys' fees and other expenses usually incident to litigation, did it not? A. Immediately after the United Railways Company took possession of this property, of course, this situation arose: As to certain suits or certain claims against the Transit Company we never had any policy, no fixed policy, as to how these things should be treated; but authorized the counsel of the company to treat those matters as in his judgment they should be treated and as they arose, not knowing anything about the merits of the case, or anything about it, and don't know of any particular case, and don't know now what has been done, but I know that on the request of the Transit Company certain moneys were paid out by the United Railways Company and charged to the account of the Transit Company."

It is shown that in pursuance of this plan the sum of $273,058.03 was paid out by the United Railways Company between November 1, 1904, and September 30, 1909, and charged against the Transit Company, on account of damage suits against the Transit Company in which appeal bonds had been furnished by the United Railways Company.

What occasion there could be for such a charge in view of the fact that since October 31, 1904, the Transit Company had been out of business and apparently had no property, the United Railways Company alone can explain.

The evidence in this case shows that the United Railways Company took from the Transit Company a large amount of property far in excess of the claim of plaintiff in this case, for which it paid no consideration and to which it acquired no title, and placed it beyond the reach of the creditors of the Transit Company.

The Transit Company had the undoubted right to prefer one creditor to another, but it could not transfer the exercise of this right to the United Railways Company, so as to authorize that company to administer its assets.

The judgment of the court below should be affirmed and it is so ordered.

*Williamson, J.*, concurs in separate opinion, in which *Walker, C. J.*, and *Williams, J.*, concur; *Blair, J.*, dissents; *Graves, J.*, dissents in separate opinion, in which *Woodson, J.*, concurs; *Goode, J.*, not sitting.

WILLIAMSON, J. (concurring).—The record in this case is exceedingly voluminous. It is made up, in large part, of the records in eleven other cases, which are thrown together in the abstract with little regard to system or relevancy. The index is a frank failure. After much labor, it is hoped that a fairly succinct statement of such facts as are essential to an understanding and a decision of this case has been obtained. It has not been thought necessary to deal with masses of figures, nor to do more than state the effect of documentary evidence, since all of those matters are very fully set out in the very exhaustive opinion of the learned Special Judge who writes the principal opinion.

On March 10, 1898, the Central Traction Company of St. Louis was duly incorporated, with a paid-up capital of one hundred thousand dollars. On July 10, 1899, by proper proceedings, its name was changed to United Railways Company of St. Louis. Thus one of the parties to this record was born. Upon changing its name, it increased its capital to forty-five million dollars—twenty-five million common stock and twenty millions preferred. Then it bought all but one of the street railways of St. Louis and was established in business.

On March 2, 1899, the St. Louis Transit Company was duly incorporated—capital three thousands dollars—and so a second party to this record was born. Shortly thereafter this capital stock was also increased, and then stood at twenty million dollars. By September 13,

1899, the United Railways Company apparently desired to quit active business, and so it "leased" everything it had—including its bank account—to the Transit Company, which then apparently desired to get into active business. This lease was to run for forty years. When all formalities were over, the Transit Company owned a clear working majority of all the voting stock of the United Railways Company, and the United Railways Company owned a clear working majority of all the voting stock of the Transit Company. Thus each company had absolute control of the other, but neither had control of itself—paradoxical, but true.

The Transit Company ran the street railways of St. Louis and the United Railways Company marked time until September 27, 1904, at which time the "Tripartite Agreement" was made. "Syndicate" was the third party to this agreement, United Railways and Transit Company being the other two. (If Syndicate's genesis is a matter of interest, it may be found in the principal opinion, and in other opinions herein cited.) By this agreement Syndicate acquired all of Transit Company's holdings of United Railways' voting stock, and numerous other things, and Transit Company agreed, among other things, that it would, on demand, at any time, surrender its lease to United Railways, and deliver, also to United Railways, all property of every kind and character received by Transit Company under the lease, and, in addition, "all cash, bills receivable or other credits then owned or held by it." Thus Syndicate owned a clear working majority of all of United Railways' voting stock, and therefore had control of United Railways, and United Railways owned, as has been said, a clear working majority of all of Transit Company's voting stock and therefore had control of Transit Company, and, in addition, was armed with the specific power to strip Transit Company at any time, on demand, of its lease and all property received under the lease, and in addition all cash and credits then belonging to Transit Company, regardless of the amount of cash and credits,

and regardless also of whether there had been a breach of the terms of the lease or not. This power United Railways was bound by contract to exercise whenever Syndicate called upon it to do so.

In the meantime, Transit Company had become liable to answer in damages to divers and sundry, and specifically to Murphy, and Madigan and Schmitt, and numerous others, for personal injuries, in large sums. These claims already were in the form of judgments, or ultimately assumed that form. The situation was charged with evil omen, for Transit Company and for its creditors. The president of United Railways was also president of Transit Company, the secretary of United Railways was also secretary of Transit Company, and the auditor of the United Railways was also auditor of Transit Company. In addition, the eleven directors of United Railways were (with a single exception) also directors, and all of the directors (with a single exception) of Transit Company, counsel for United Railways was counsel for Transit Company, the stockholders of both companies were, in the main, identical—and United Railways was controlled by Syndicate. Less than thirty days after the execution of the "Tripartite Agreement," on October 26, 1904, to be exact, United Railways demanded that Transit Company should instantly surrender up its lease and all assets received under the lease, and all cash, bills receivable and other credits as provided in the "Tripartite Agreement," and on October 29, 1904, thirty-two days after the execution of the "Tripartite Agreement," Transit Company complied, in minutest detail, with that demand. It not only complied with the terms of the Tripartite Agreement, and of the demand made under it, but it went much farther. It voluntarily delivered to United Railways all other property which it had accumulated during the five years it had been operating the railway system, and of these accumulations there seems to have been a huge volume. A detailed statement of this sum and its items is found in Barrie v. United Railways Co., 138 Mo. App. 557,

and need not be repeated here. This surplus was delivered, gratuitously, when no obligation, contractual or otherwise, existed requiring its delivery, and when its delivery had not even been demanded. Section Fourteen of the lease did indeed call for the forfeiture of all this surplus in the event of a breach by Transit Company of the terms of the lease, but there was no pretense, even, that any breach had occurred. There was no provision, even in the Tripartite Agreement, calling for this sacrifice·

Murphy, Madigan, Schmitt, et al. had not been paid, however, and the "Tripartite Agreement" carried no guarantee that they ever should be paid. Thereupon, Murphy, Madigan, Schmitt et al. assigned their judgments to respondent Johnson, who brought this suit. Johnson claims that United Railways took back from Transit Company some millions more than it "leased" to that now financial derelict, and that a court of equity should compel United Railways to pay the judgments of Murphy, Madigan, Schmitt et al. United Railways denies this claim, and asserts that neither at law nor in equity is it bound to pay any of those judgments, and in its briefs filed herein, (though not in its pleadings) it intimates that Johnson has no standing in a court of equity, his hands being lacking in that degree of cleanliness which entitles him to be heard, for he purchased the judgments in question at too low a price, to-wit, at about one third of their face value, but inasmuch as even that sum was exactly that much more than United Railways would pay, or than Transit Company could pay, after Syndicate and United Railways had taken possession of all of its assets, that suggestion cannot be taken seriously. Respondent has a justiciable claim and as between the parties to this action that fact suffices.

What is the salient question in this case? It is stated negatively by the eminent counsel for appellant in point three in his brief in this case, as follows: "Plaintiff is not entitled to recover because he has neither shown that appellant Railways Company agreed to as-

sume the liabilities of the Transit Company, or that it took the assets of Transit Company without any or adequate consideration.'' It is conceded that United Rail-ways did not expressly agree to assume the liabilities of Transit Company which are here in suit. All that then remains to be answered is, did United Railways take the assets of Transit Company without any or adequate consideration? This is the crux of the whole controversy.

This is a question of fact. But if authority be sought for any questions of law hereinafter touched upon, it may be found in abundance in Barrie v. United Railways Co., 138 Mo. App. 557; Johnson v. United Railways Co., 247 Mo. 326, and the cases hereinafter cited. The opinion in the Barrie case, supra, was in express terms adopted and approved in the Johnson case just cited.

It may be noted, in passing, that the parties to · the Tripartite Agreement view the claims of Murphy, Madigan, Schmitt, et al., with large indifference. Mr. Murray Carleton, president of the United Railways and president also at the same time of Transit Company, testified as follows: ·

''Q. You had no concern about people who had claims against the Transit Company, as to whether they were paid or not paid? A. None whatever.

''Q. And you didn't care anything about it? A. Not a particle.''

Mr. Carleton by virtue of his office as president of Transit Company (it then being insolvent) was, in a sense, a trustee of an express trust for the benefit of ''people who had claims against Transit Company.'' ''To the extent to which the assets of a corporation may be regarded as a trust fund for its creditors, the directors are undoubtedly the trustees of those assets for the creditors of the corporation.'' [10, Cyc. 788; Fogg v. Blair, 139 U. S. 118, 1. c. 126; Sawyer v. Hoag, 17 Wall. 610; Upton v. Tribilcock, 91 U. S. 45; Upton v. Tribilcock, 91 U. S. 56; Hatch v. Dana, 101 U. S. 205; County v. Allen, 103 U. S. 498.] There is no question but United Railways knew of the claims against Transit

Company. Having the same executive officers, the same claim department, the same counsel, and with a single exception of one member of each board, the same individuals upon the board of directors of each, notice to one company was necessarily notice to the other. It is also beyond dispute that United Railways Company took over every vestige of the assets of Transit Company. In the terse language of Mr. Carleton, Transit Company simply "moved out," and United Railways "moved in." The consideration for this transfer it appears also by the testimony of Mr. Carleton, president of both companies and presumably in position to know, was the release by United Railways of the obligations imposed upon Transit Company by the lease, and some "circumstances." Witness the following:

"Q. Now, Mr. Carleton, isn't it true that the only consideration that the Transit Company ever received in this agreement, as far as you understood, was a mere discharge of liability under the terms of its leasehold? A. No, sir.

"Q. Well, what else did the Transit Company get? . . . . A. Well, by consideration I suppose you mean that there was some substantial consideration. I will state that there were circumstances.

"Q. There were circumstances? A. Yes, sir.

"Q. But no actual consideration? A. No, no consideration but circumstances."

However, it may be assumed, and the record, indeed, seems to show, that the "circumstances" referred to were the assumption by the United Railways Company of certain large obligations of Transit Company, already, for the most part, liens upon the property, but not including the claims here in question.

The question then arises whether or not the discharge of Transit Company from the obligation of its lease, together with the assumption of certain obligations of Transit Company by United Railways, constituted a fair consideration for this transfer. On this point there is a sharp conflict in the evidence. The value of the lease

thus surrendered by Transit Company is estimated by some witnesses at sums varying from three millions to thirty-two millions of dollars, and other witnesses with equal confidence testify that it was a liability and not an asset. Inasmuch as this lease still had about thirty-five years to run, and covered one of the large street railway systems of the country, it seems improbable that it was valueless, and much more likely that its value was great:

The questions involved in this case are not new in a court of equity. Practically the indentical facts here involved and all matters of law growing out of them, have been adjudicated in various trial courts, in the St. Louis Court of Appeals, and in this court in other cases and are now presented anew in this case. In Johnson v. United Railways Co., 247 Mo. 326, this court, referring to the question of the adequacy of the consideration paid by United Railways, said, in substance, that United Railways "was benefited in vast amounts by relief from its bond guaranties, from the release of its lease, thereby taking over the leasehold estate enormously bettered and swollen by the outlays of Transit Company and of great value; it got over $600, 000 in cash from the Transit Company, a great amount of other assets in supplies, and at the end came out the owner of a great block of stock once the property of Transit Company. So, it stepped into a business . . . that netted over a million dollars the last year it ran (a phenomenal year, it is true) and took over a plant of which its president boasted it was equipped so well it needed no extra expense for betterments for a considerable time." [Johnson v. United Railways, supra, 1. c. 363.] Later in the same opinion, 1. c. 366, reference is made to the "disproportionate gains accruing from the transaction as compared to what was paid out."

The same matters were in issue in the the Barrie case, supra, and in that case the St. Louis Court of Appeals concluded "that the liabilities claimed to have been assumed as a consideration by the United Railways for

11—281 Mo.

taking over the assets of the Transit Company did not equal, by a large sum, the assets turned over.'' [Barrie v. United Railways, supra, l. c. 667.]

Both in the Johnson case and the Barrie case, the findings of the trial courts were evidently in harmony with the conclusion of the Courts of Appeals and of this court upon this question. In this state of affairs, it is not only proper to give some weight to the findings of the trial court, but it is entirely proper, also, to give strongly persuasive effect to the fact that the appellate court in each instance agreed with the chancellor below upon the question of fact. That question has already been decided adversely to appellant five times; once by the trial court and once by the St. Louis Court of Appeals in the Barrie case, supra; once by the trial court and once by this court in the Johnson case, supra, and again by the trial court in this case. There is nothing in the voluminous and jumbled record before us in this case to justify a different holding now. It is reasonable to conclude that United Railways did not pay a fair consideration for the property it took over from Transit Company, and that the difference between the amount actually paid and the value of the assets actually received was largely in excess of respondent's claims. This difference, whether it arose from the value of the unexpired term of the lease or from any other source, was the property of Transit Company, and was a trust fund for the payment of its debts. Why, then did Transit Company deliver this surplus to United Railways, when its delivery had not even been demanded? There is and there can be but one explanation for this extraordinary action. Transit Company was, at that time, a mere name, ''a shadow cast by turning''—and a devious turning at that. It was ''such stuff as dreams are made of,'' devoid of any will or power of its own, and incapable of contracting to the detriment of its creditors. Much is said in the briefs on the question of whether the course of conduct between these two companies which resulted in the delivery of all of the assets of the one to the other

was a sale, an entry under the terms of the so-called lease, a voluntary surrender by Transit Company, or what not. The question does not seem to be of more than academic interest, so far as this case is concerned. By whatever name it may be called—and, indeed, it might well be described as "a deed without a name"— it was utterly void as to creditors, and no time need be consumed in naming it.

"Corporations, insolvent or financially embarrassed, often find it necessary to scale their debts and re-adjust stock issues with an agreement to conduct the same business with the same property under a reorgani-zation. This may be done in pursuance of a private con-tract between bondholders and stockholders. And though the corporate property is thereby transferred to a new company, having the same shareholders, the trans-action would be binding between the parties. But, of course, such a transfer by stockholders from themselves to themselves cannot defeat the claim of a non-assenting creditor. As against him the sale is void in equity, re-gardless of the motive with which it was made. For if such contract reorganization was consummated in good faith and in ignorance of the existence of the creditor, yet when he appeared and established his debt the sub-ordinate interest of the old stockholders would still be subject to his claim in the hands of the reorganized com-pany. Cf. San Francisco & N. P. R. R. v. Bee, 48 Cal. 398; Grenell v. Detroit Gas. Co., 112 Mich. 70." [North-ern Pacific Ry. Co. v. Boyd, 228 U. S. l. c. 502.]

In the Boyd case, the property which was held to be subject to his claim had been sold under order of court and had again been sold by the purchaser at that sale, yet the second vendee was nevertheless held liable. There is nothing new in the case at bar, except, perhaps, some minor details in the method. The general scheme and plan does not differ in principle from similar transac-tions called in question and held void in hundreds of cases. Neither is there any doubt or novelty about the equitable principle upon which such transactions are and should be held void.

"It is a well-settled principle of equity jurisprudence that a party holding a fiduciary relation to trust property cannot, either directly or indirectly, become the purchaser of such property, or transfer it to his own use or for his benefit; and if he does, the sale or transfer is voidable, and will be set aside at the mere pleasure of the beneficiaries, although such fiduciary may have paid a full price and gained no advantage. [Newcomb v. Brooks, 16 W. Va. 32, 59, and cases cited.] In, Reilly v. Oglebay, 25 W. Va. 36, 43, this court, following Newcomb v. Brooks, supra, says: 'This rule is not confined to trustees and fiduciaries in the technical sense of those terms, but it extends to every person coming within the reason of the rule. In embraces trustees, guardians, executors, administrators, agents, cashiers of banks, factors, auctioneers, sheriffs, commissioners in bankruptcy, and their solicitors, assignees of bankrupts, attorneys at law, *directors of corporations,* and parties bearing many other relations to each other which may not be classified.' Newcomb v. Brooks, 16 W. Va. 63; Abbott v. American Co., 33 Barb. 578." [Sweeney v. Sugar Co., 30 W. Va. 443, l. c. 450.]

If further authority is desired, it may be found in any rudimentary work on equity jurisprudence, and practical application of the doctrine, fully supporting the conclusions herein announced, may be found in the following cases: Grenell v. Detroit Gas Co., 112 Mich. 70; Fort Payne Bank v. Sanitarium, 103 Ala. 358; Missouri Lead Co. v. Reinhard, 114 Mo. 218; Bertholdt v. Holladay-Klotz Co., 91 Mo. App. 233; Montgomery Web Co. v. Dienelt, 133 Pa. St. 585; Singer v. Hutchinson, 183 Ill. 606; Barksdale v. Finney, 14 Gratt. 338; Chicago Ry. Co. v. Ashling, 160 Ill. 373; Camden Interstate Ry. Co. v. Lee, 84 S. W. 332.

After all, when stripped to its essential elements (and, an effort has been made in this opinion so to strip this case), the question to be decided is a very simple one. Appellant wrongfully appropriated property to which respondent was entitled to look for the payment

of his claims. This cannot be done. The hand of a court of equity is not stayed by metaphysical distinctions nor by specious reasoning as to questions of separate corporate indentity, nor are the issues clouded by the ceremonial of separate, though in individual composition practically identical, boards of directors, nor technically existent, but in fact wholly imaginary, powers of corporations, bound together as these two corporations are shown to have been, to contract freely together and thereby to bind the rights of third parties. Equity looks to substance rather than to form, and will not sanction an unconscionable result merely because it may have been brought about by means which simulate legality. "The property was a trust fund charged primarily with the payment of corporate liabilities. Any device, whether by private contract or judicial sale under consent decree, whereby stockholders were preferred before the creditor, was invalid" [Northern Pacific Ry. v. Boyd, 228 U. S. 1. c. 504.] The sum of the whole matter is that when the minutes all were written and the contracts all were drawn, when the stocks and bonds had all been shuffled and shifted and results were all disclosed, it was found that Syndicate had reaped a profit of a quarter of a million dollars; United Railways had gathered profits estimated by some witnesses in indefinite millions and described in opinions of this court, and, of the St. Louis Court of Appeals, as "large sums" and "disproportionate gains;" Transit Company had been stripped to its naked hide; and Murphy, Madigan, Schmitt, et al. had been left unpaid and confronted by another law suit.

What is there in all this legal labyrinth to bar the course or stay the hand of justice? There is nothing. "Justice moves with a leaden heel, but strikes with an iron hand." And so, with little effort, the hand of justice cleaves its way through all entanglements to seize upon the vital fact—five times heretofore found to be a fact—that United Railways took more than it paid for. It must answer for it. Thus shall vindication come to the rights of Murphy, Madigan, Schmitt et al., the humble victims

of Transit Company's negligence and of United Railways Company's greed.

The judgment of the trial court should be affirmed: *Walker, C. J.,* and *Williams, J.,* concur.

GRAVES, J. (dissenting).—In this case, I dissent from the opinion by the learned Special Judge, for the reason expressed by VALLIANT, C. J., in the case of Johnson v. United Railways Co., 247 Mo. l. c. 366. *Woodson, J.,* concurs in these views.